ANNA E. O'BRIEN, PETITIONER-APPELLANT, v. FIRST CAMDEN NATIONAL BANK & TRUST COMPANY, RESPONDENT-RESPONDENT.

Argued February 5, 1962—Decided April 2, 1962.

*Mr. Joseph R. Moss* argued the cause for petitioner-appellant.

*Mr. A. Millard Taylor* argued the cause for respondent-respondent.

The opinion of the court was delivered by

FRANCIS, J.   In this workmen's compensation case the issue is whether decedent's fatal accident arose out of and in the course of his employment.   The Deputy Director made an award, the County Court reversed, 64 *N. J. Super.* 127 (1960), and was affirmed by the Appellate Division, 68 *N. J. Super.* 177 (1961).   We granted certification, 36 *N. J.* 135 (1961).

On August 4, 1958, decedent, Joseph O'Brien, was engaged as a bank guard and custodian by First Camden National Bank & Trust Company.   He was employed to work at a newly constructed branch located at the northwest corner of Black Horse Pike and Browning Road in the Borough of Bellmawr.   The bank was opened to the public for business

on August 14, 1958.  From August 4 to 14, O'Brien reported for work at 8 A. M., quite obviously the time fixed for the beginning of his day, and did odd jobs and janitorial work while awaiting the formal opening of the bank.  Shortly before August 14 he was sent to the employer's main office where, for a day or two, he received instruction about his functions as guard and custodian, the uniform he was to wear and the gun he was to carry.

Part of O'Brien's obligation, at least from August 14 on, was to open the bank at 8 A. M.  He was given possession of the key in order to do so.  At some time before August 14, just when does not appear, his superior told him that instead of coming to the bank first he should go to borough police headquarters, where an officer in a radio patrol car would be designated to drive him, or go with him to the bank, and stay with him while he opened up and made certain that everything was safe.  This arrangement resulted from conferences between the bank manager and the chief of police.  They agreed that the opening time when O'Brien would be alone was a "risky" period and such a plan was advisable for security reasons.  This meant, of course, that if the bank was to be opened on the hour, O'Brien's work day had to begin early enough so that the new incidental mission could be accomplished before that time.

Why it was deemed necessary to send O'Brien to police headquarters for the radio car and the officer, rather than simply have that officer or some other one meet him at the bank at 8 A. M. each day, was not explained.  Although there was some discrepancy in the testimony, the Deputy Director in his determination said police headquarters is about 200 feet east of the bank.  In any event, it is located a short distance away on Browning Road on the same side of the street as the bank.  The police chief testified the arrangement was a "preliminary" one.  It may have been considered an experimental procedure at its inception because of the imminence of the bank opening and the new-

ness of its operation. No specific proof was adduced on the subject to contradict the chief's statement. Since, for purposes of this case, we are concerned with the situation as of August 14 and thereafter until O'Brien's fatal accident on September 9, 26 days later, it seems just to consider the security plan as it was described, *i. e.,* a preliminary one. It is so referred to in the Deputy Director's findings.

O'Brien lived on Creek Road, Bellmawr, some distance west óf Black Horse Pike. The bank is located on the northwest corner of Browning Road and Black Horse Pike. Decedent resided with his son, who drove him to work in the morning. Prior to inauguration of the security arrangement, the son proceeded in an easterly direction to a point opposite the bank and dropped his father there in time to report for duty at 8 A. M. Beginning with August 14, however, the son did not stop on reaching the bank; he continued east on Browning Road the short distance to police headquarters, at which point his father alighted and walked across the street. When the police escort joined him, O'Brien retraced the distance to the bank and opened the door under the watchful eye of his companion.

On September 9, 1958, at about 7:55 A. M., decedent's son drove him past the bank and, as usual, dropped him opposite police headquarters. While crossing the street he was struck by an automobile and suffered fatal injuries.

Petitioner, decedent's widow, sought workmen's compensation against the bank on the ground that her husband had come to his death as the result of an accident which arose out of and in the course of his employment. The claim was resisted on the theory that O'Brien was just coming to work when injured; that his day of service to the employer had not yet begun, and would not begin until he actually stepped from the public sidewalk onto the police headquarters premises. The Deputy Director felt that O'Brien was engaged in a "special errand" for the bank at the time of the accident and so was in the course of his

employment. The County Court and Appellate Division decided to the contrary, declaring that he was simply on his way to report for duty and had not yet entered the active service of his employer.

In the administration of workmen's compensation laws, a doctrine grew up known as the "going and coming" rule. In the jurisdictions where adopted, it signified that until an employee came on the employer's premises he was not in the course of employment; also, that at the end of the work period on leaving the premises he stepped out of the course of employment. In short, injuries received *en route* to and from work were said to be non-compensable. 1 *Larson, Workmen's Compensation Law* (1952) § 15.00. New Jersey took the same position. *Gullo v. American Lead Pencil Co.,* 119 *N. J. L.* 484 (*E. & A.* 1938); *Moosebrugger v. Prospect Presbyterian Church,* 12 *N. J.* 212 (1953). The sweeping generality of the rule inevitably spawned exceptions. *Neumeister v. Eastern Brewing Corporation,* 73 *N. J. Super.* 193 (*App. Div.* 1962), certif. den. 37 *N. J.* 88 (1962); *Ryan v. St. Vincent de Paul Roman Catholic Church,* 41 *N. J. Super.* 206 (*App. Div.* 1956); *Cerria v. Union News Co.,* 31 *N. J. Super.* 369 (*App. Div.* 1954); *Bradley v. Danzis Pharmacy,* 5 *N. J. Super.* 330 (*App. Div.* 1949); *Bobertz v. Board of Education of Hillside Tp.,* 134 *N. J. L.* 444 (*Sup. Ct.* 1946), reversed on other grounds 135 *N. J. L.* 555 (*E. & A.* 1947); *Larson, supra,* §§ 15.12, 16.00–17.00. Within the spirit and logic of the qualifications it may be said that a turning aside from the customary route to or from work in order to do something for and at the direction of the employer brings the employee within the course of his employment, at least during the side trip. A like conclusion should be drawn where, for the same reason in coming to or going home from work, he goes beyond his usual place of work or beyond his home. During the extension of the journey and while retracing his steps, he must be considered within the protected scope of his employment. See, *e. g.,*

*Sheehan v. Board of Trustees,* 256 *App. Div.* 148, 9 *N. Y. S. 2d* 235 (*App. Div.* 1939); *Martin v. Lavender Radio & Supply, Inc.,* 228 *Ark.* 85, 305 *S. W. 2d* 845 (*Sup. Ct.* 1957).

■ The various exceptions adopted have in turn brought back into sharper focus the basic statutory test of compensability, that is, whether under the facts and circumstances of the particular situation the injury arose out of and in the course of the employment. Too easy reference to the subordinate going and coming precept manifestly pointed in the direction of injustice in particular fact complexes.

Application of this basic test to the facts in a given case must be engaged in with an appreciation of the beneficent social purpose of workmen's compensation. When so applied, if it can be said reasonably that the employee is serving an incidental interest of his employer at the time of injury, the right to compensation exists.

It seems obvious that under O'Brien's original contract of hire his work day began at the bank at 8 A. M. Whether between August 4 and 14, while the place was being readied for public use, he had custody of the key and opened up in the morning was not shown. But at some time prior to the formal activation as a bank on August 14, the opening hour was set at 8 A. M. and O'Brien was assigned the task of making the place available for business by unlocking the door at that time. In addition, he was given a further duty which had to be performed and completed by 8 A. M. That task was to proceed beyond the bank to police headquarters, pick up the officer for protection, return with him to the bank and open it up by 8 A. M. Whether the employer had decided as of August 14 that this trip beyond its premises was to be a temporary arrangement was not specifically proved. (It is not necessary for us to decide under the present circumstances if the nature of the trip as temporary or permanent would make any difference on the issue of compensability.) A fair inference from the police chief's testimony is that final deci-

164

sion thereon had not been reached. As has been suggested above, the desired police protection could have been realized without calling upon O'Brien to proceed past his usual place of work in the morning.

The only reason O'Brien did not enter the bank on September 9 and begin his day's work rather than pass by, was to perform a service for his employer. The necessity for that trip was created by the employment. Traveling between the bank and police headquarters at a time earlier than 8 A. M. was indispensable to the fulfillment of a duty incidental to the resumption of the employer's business for the day. That business was at a standstill until O'Brien returned with the key and the police officer and opened the bank. In our judgment, therefore, when he passed the bank and started on his way to police headquarters, he began the rendition of a service for the employer and so entered the course of his employment. Thus, when the accident happened, time, place and circumstances had merged in the interest of and at the direction of the employer to put him where he was. This is the sense of the *Ryan, Cerria, Bradley* and *Bobertz* cases, *supra.* Compare also: *Cavness v. Industrial Commission,* 74 *Ariz.* 27, 243 *P. 2d* 459 *(Sup. Ct.* 1952) ; *Katz v. Katz,* 137 *Conn.* 134, 75 *A. 2d* 57 *(Sup. Ct. Err.* 1950) ; *Locke v. Steele County,* 223 *Minn.* 464, 27 *N. W. 2d* 285 *(Sup. Ct.* 1947) ; *Schwimmer v. Kammerman & Kaminsky,* 262 *N. Y.* 104, 186 *N. E.* 409 *(Ct. App.* 1933) ; *Makins v. Industrial Accident Commission,* 198 *Cal.* 698, 247 *P.* 202, 49 *A. L. R.* 411 *(Sup. Ct.* 1926).

The judicial obligation imposed by the Legislature to administer the Workmen's Compensation Act liberally to accomplish its beneficent purposes would be subverted by as extensive an application of the going and coming rule as is sought here. Legislation of this type cannot be given a too restricted construction either as to hours of service or premises of the employer or course of employment. Such would be the case if it were adjudged on the facts that the

decedent did not enter his employment until he put his foot in police headquarters.

We have no doubt that many hypothetical situations of varying factual content can be conjured up in an effort to appraise the outer limits of our holding here. Obviously, there can be no precise or all-inclusive articulation of those limits. The Legislature has established the broad boundary for determining compensability: Did the accident arise out of and in the course of the employment? As has been said, the answer in each case depends on the particular facts when examined with an eye sympathetically focused upon the purpose the lawmakers sought to achieve. In this instance, on the facts presented, we agree with the finding of the Deputy Director that when O'Brien came to his death he was within the area of his employment and serving the interests of his employer.

The judgment of the Appellate Division is reversed and the award to petitioner is reinstated.

WEINTRAUB, C. J. (concurring). I agree with the result but would place it on a broader base.

Under the majority opinion, the deceased entered the course of his employment when he passed the bank, but, if the police headquarters had been between his home and the bank, his work would not have begun until he reached the station. Thus the case turns upon the relative locations of the three places I have mentioned.

To me, the question is whether the deceased was discharging a duty of his employment when the accident occurred. If an employer provides that his employee stop at his place of employment (here the bank) before entering upon his first job assignment (going to headquarters), he would not *in fact* be furthering his employment until he reported at his place of work. But if the employer directs the employee to achieve a specific mission before reaching the established place of work, the employee *in fact* is pursuing his job instructions the moment he embarks upon that

mission, *i. e.,* when he leaves his home to accomplish it. Hence I would hold deceased entered the course of his employment at that point.

HALL and HANEMAN, JJ. (dissenting). We would affirm the judgment of the Appellate Division for the reasons expressed in its opinion reported at 68 *N. J. Super.* 177.

Chief Justice WEINTRAUB and Justice JACOBS concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5.

*For affirmance*—Justices HALL and HANEMAN—2.