76 N.J. Super. 484 (1962)
184 A.2d 891
FELIX MEO, PETITIONER-APPELLEE,
v.
COMMERCIAL CAN CORP., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Bergen County Court, Law Division.
Decided October 19, 1962.
*485 Mr. Herman M. Wilson for petitioner-respondent (Mr. David B. Geltzeiler, attorney; Mr. Wilson, on the brief).
Mr. Frank Fink for respondent-appellant (Mr. James J. Carroll, attorney).
MALECH, J.D.C. (temporarily assigned).
The petitioner in this workmen's compensation case was allowed compensation in the Workmen's Compensation Division. The employer appeals.
The claim petition alleges that the petitioner suffered injuries at his dwelling premises as a result of being assaulted by unknown assailants arising out of a labor dispute. The answer admits nothing and denies that compensation is payable for the reason that: "Respondent denies accident, notice, knowledge or compensable injury * * *."
On this appeal the issue stated by the employer is: "Does a workman, who is off duty, while leaving his home to go to work, and who is assaulted within the confines of his home, come within the purview of our Compensation Acts?" The employee claims that the assault upon him constitutes an accident arising out of and in the course of his employment.
The issue arises from the following factual background:
Felix Meo, the petitioner, was employed for several years by Commercial Can Corp., the appellant, as its plant superintendent in charge of production, at a salary of $450 per week. He had multiple duties and was "on call" at all hours *486 of the day and night when the occasion required, in order to maintain the plant's uninterrupted operation. In that connection he was also required to attend various executive as well as physical duties. In addition to its operations elsewhere, the appellant operated a Newark plant in which the petitioner was mainly employed.
The appellant's Brooklyn plant went on strike November 15, 1959, and its Newark plant went on strike on February 1, 1960. Eighty of its 105 employees at the Newark plant were out on strike. The strikers were members of Local 810 of the Steel, Metal Alloy and Hardware Fabricators and Warehousemen affiliated, with the Teamster's Union. Meo was ordered by his employer to keep the Newark plant in operation despite the strike, and among his other duties he interviewed and hired various persons to replace those who were out on strike. Among some of the employees who continued to work were five relatives of Meo, some of whom were with management and some of whom were union members. Because of his activities in behalf of the management of the appellant corporation, union representatives on a number of occasions argued with him, came to the plant where he was employed, and made threats if he continued his activities in behalf of the management. On one occasion on March 14, 1960 Meo reported to the Newark Police Department the threats of a former employee of the appellant who threatened to shoot him if he continued his activities. On one occasion when representatives of the union were at the plant making threats a member of the Newark Police Department came to the appellant's plant as a result of such threats made arising out of the labor strike. There was obvious open and violent hostility by the strikers towards Meo for his loyalty to his employer during the strike. Active continuous and violent picketing took place around the plant premises. Members of the Newark Police Department patrolled the picket lines to prevent violence. It was a violent type of strike and on many occasions the picketing strikers engaged in stone throwing, name calling and various acts of *487 violence, calling for physical police intervention. The officers of the appellant corporation were obviously aware of the tense situation, and on one occasion when Meo discussed the strike situation with the president of the appellant corporation, the president stated in substance that the Newark plant must be kept open despite violence to any of its employees, and that he would personally attend to anything that happened so that the employees had nothing to worry about.
On two different occasions when the petitioner was driving home in a company-owned automobile operated by his son-in-law, who was also employed at the Newark plant, two striking employees whom the petitioner recognized tried to run his car off the New Jersey Turnpike. In February 1960 he had received a call from the president of the company warning him to be careful and never to leave his home alone, and to notify the police in the municipality where he resided in order to obtain maximum protection. Meo did in fact report this to Chief Michael Barrett of the Fairview Police Department and was afforded a form of police protection and surveillance of his home. Because of his duties as plant superintendent in charge of production, and because he was required to be available at all hours when the company needed him, Meo was furnished with a company-owned car which he used and garaged at his home at night. Meo resided with his wife and two daughters at home at Fairview, New Jersey.
During the strike period Meo and his wife received numerous threatening telephone calls during the day and also during the night. A son-in-law, John Bellomo, was also employed at the Newark plant. Bellomo resided two houses away from the home of Meo. Meo and his son-in-law travelled together in the company car to and from work at the Newark plant each day. The strike at the Brooklyn plant started sometime in November 1959, and the strike in the Newark plant started in February 1960. During the course of the strike, when Meo would leave the Newark plant *488 by automobile two motorcycle police escorts would accompany him to the Newark boundary line, almost to the Turnpike, in order to afford protection from the strikers.
During the morning of March 30, 1960 Meo's wife prepared breakfast for him at his home at 272 Dey Avenue, Fairview, New Jersey. After completing breakfast Meo proceeded from his home to his garage where the company car was garaged and drove the car out of the garage. He then waited for his son-in-law to arrive so that both could proceed to work in Newark. While the car was on the premises, something attracted his attention and he got out of the car. While his attention was thus distracted Meo suddenly heard someone say "here is the lousy scab" or "here is that dirty scab." At that point Meo lost consciousness. The next thing he knew was when he woke up in the hospital seriously injured. His injuries consisted of a broken jaw, bruises over his back, eight stitches in the back of his head, and loss of three teeth, in addition to other injuries.
Helen Meo testified that on the morning in question, March 30, 1960, after her husband had left the house and had taken the car out of the garage, she saw three men running by, one of whom had a baseball bat in his hand. She further testified that she then knew that something was wrong, ran out the door, called to her husband, received no answer, and then saw him lying on the ground unconscious in a pool of blood all battered up. She was unable to identify any of the three men, other than an identification that they wore brief jackets, short jackets, working jackets.
Bellomo, the son-in-law, testified that on the morning in question he was aware of three young fellows but paid no particular attention to them. When he arrived at the Meo home he saw his mother-in-law running in the front door screaming, and then saw Meo, his father-in-law, lying face down in the yard by his home. Bellomo further testified that he saw a wooden bat, a stick, a round stick, about an inch and a half in diameter and about two feet long, lying *489 nearby. Bellomo was unable to identify any of the three persons he had seen that morning.
It is conceded by the parties that the essential facts are not in dispute. The appellant in its brief states the facts and the issue as follows: "Felix Meo, the petitioner, was assaulted while on his own premises. He was leaving to go to work. While waiting for his son-in-law he was assaulted. He heard someone say: `Here is the lousy scab.' That is all that he heard as he was assaulted and rendered unconscious." "Does a workman, who is off duty, while leaving his home to go to work, and who is assaulted within the confines of his home, come within the purview of our Compensation Act?"
Meo contends that the assault upon him constitutes an accident arising out of and in the course of his employment. It is settled law that an assault is considered to be an accident within the contemplation of the Workmen's Compensation Act.
"It is well settled that an assault may be deemed to be an `accident' within the Workmen's Compensation Act despite its willful or criminal nature. Grant v. Grant Casket Co., 137 N.J.L. 463 (Sup. Ct. 1948), affirmed 2 N.J. 15 (1949)." Cierpial v. Ford Motor Co., 16 N.J. 561 (1954).
It is also settled law that an injury suffered during the course of the work by an employee does not per se entitle one to the benefits of the Workmen's Compensation Act. It must also appear that the injury arose out of and in the course of the employment. The statutory language, arising "out of and in the course of" the employment has received various interpretations by our highest court. One of the recent declarations of interpretation, in the case of Diaz v. Newark Industrial Spraying, Inc., 35 N.J. 588 (1961), is as follows:
"* * * Rather the case requires the application of a realistic view of reasonable human reactions to working conditions and associations with people encountered in the course of employment.
*490 The history of judicial interpretation of the statutory words `out of and in the course of' the employment indicates clearly that upon the facts of each case a determination is made of whether the subject accident was `work-connected' or whether the accident was `unrelated' to the employment. In Tocci v. Tessler & Weiss, Inc., 28 N.J. 582 (1959), we noted the emphasis of the liberal view taken by our courts involving the `out of and in the course of' provision beginning with the rule laid down in Bryant v. Fissell, 84 N.J.L. 72 (Sup. Ct. 1913), which stated that an accident arises out of the employment if it results from a risk `reasonably incidental' thereto."
Meo claims that the strike conditions during the period of the assault subjected him to the environment of continuous hazards of employment. His multiple duties for his employer were not confined to the zone of the plant premises at all times. It is true that at the time of the assault he was still in the yard of his home premises preparing to go to work in the company-owned car. If liability is to be established by reason of the extenuating circumstances surrounding the employment conditions, it cannot be predicated upon the theory that he was actually engaged at work for his employer at the time of the assault. Such is not the fact. It is a fact, however, that during the period of the assault he was engaged in the hazardous employment of furthering the plant operations against the organized efforts of strikers who did not limit their endeavors to the area of the plant premises as provided by law. The strikers resorted to means other than picketing outside the plant premises. The strike area had in fact expanded from beyond the plant area to any area where Meo happened to be at the time. It included the plant area, the roadway, the New Jersey Turnpike where strikers attempted to run him off the road, and it extended to the area of his home where he and his wife received frequent threats and where the assault actually occurred. Meo was a leader in a strike that had actually erupted into physical violence preceding the date of the assault.
Liability is predicated by Meo upon the theory of an employment hazard directly chargeable to the employer; that *491 is, that the employment constituted a direct contributory cause of the assault. He claims that the risk of assaults was clearly known and contemplated by the appellant before the actual assault occurred. Appellant warned him of the probability of violence, and urged the importance of keeping the plant operating despite the threatened violence.
The trend of our decisions appears to be that our courts do not attempt to define with exactness what is meant by the phrase "arising out of and in the course of the employment." Our courts leave to the facts of each case the determination as to whether the accident falls within the liberal view of being "work-connected," or a risk directly associated with the employment. It cannot be doubted that the employment in which Meo was engaged during the period of the strike subjected him to a greater hazard than that which existed before the strike commenced. I am satisfied that the work during the strike period was extra-hazardous. Although Meo's assailants were not identified, an inference may logically be drawn from the facts and circumstances surrounding Meo's employment to establish a causal connection between the hazardous conditions inherent in his employment during the strike period and the resulting assault and injury. The only probable or reasonable explanation for the assault deducible from all of the proofs in the case is apparent in the threats, the violence of the strike, and the totality of the circumstances surrounding the labor dispute.
The proofs satisfy me that the assault arose in connection with the labor dispute then existing between the appellant and the union. Not only could a reasonable person familiar with the circumstances and conditions surrounding the labor dispute logically conclude that the assault upon Meo followed as a natural incident to his work as plant superintendent, and as a risk occasioned by the nature of his employment in behalf of the management, but in fact the employer knew of the hazardous conditions and specifically instructed Meo to continue his efforts "at all costs" in order to keep the plant in operation. The employer in this case specifically *492 requested Meo to assume the extra-hazardous risks in order to serve his employer.
The legislative boundaries for determining compensability in a workmen's compensation case are to be liberally construed in a proper case in order to accomplish the purpose the lawmakers sought to achieve. I find that the assault upon Meo was work-connected. I further find that Meo has established by the preponderance of the believable evidence that he suffered injuries by reason of an accident arising out of and in the course of his employment.
The judgment of the judge of compensation of the Division of Workmen's Compensation is affirmed in all respects.
An appropriate order will be submitted.