80 N.J. Super. 58 (1963)
192 A.2d 854
FELIX MEO, PLAINTIFF-RESPONDENT,
v.
COMMERCIAL CAN CORP., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1963.
Decided July 3, 1963.
*59 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Frank Fink argued the cause for appellant (Mr. James J. Carroll, attorney).
Mr. Herman M. Wilson argued the cause for respondent (Mr. David B. Geltzeiler, attorney; Mr. Wilson, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal from a County Court judgment affirming a Workmen's Compensation Division award in favor of petitioner Meo against his employer, Commercial Can Corporation. The County Court opinion appears in 76 N.J. Super. 484 (1962).
The company concedes that the facts are not in dispute and credibility therefore plays no part in the consideration of the case. Indeed, the company could take no other position because the facts surrounding the accident were established solely through the testimony of Meo and his witnesses. The employer limited its case to the medical testimony of two doctors going to the extent of disability suffered by petitioner. Only the more significant facts need be referred to; a somewhat more detailed account may be found in the cited County Court opinion.
Meo had been Commercial Can's plant superintendent in charge of production for a number of years at a salary of $450 a week. Although the company had three plants  Brooklyn, Newark and Pittsburgh  his almost sole concern was clearly *60 with the Newark plant. Meo was on call 24 hours a day, day and night  as occasion required  so that plant operations might continue uninterrupted. He had multiple duties, executive as well as physical.
The Brooklyn plant went on strike November 15, 1959. On February 1, 1960 some 80 of the 105 employees at the Newark plant, members of a local affiliated with the Teamsters' Union, went out on strike. Meo was ordered by the company president to keep the Newark operation going, and to this end he, among other things, interviewed and hired workers to replace those who had struck. Among the employees who continued to work were five relatives of Meo, including his son-in-law, John Bellomo. Some of the five were union members; others belonged to management. Meo lived in Fairview, N.J., two doors from Bellomo. The company had provided Meo with a car to travel to and from the plant. Bellomo accompanied him on these trips. Meo testified that during the strike he hired some replacement workers at his home, and there were a number of meetings there to plan work schedules.
The strike was a violent one, attended by active, continuous and disorderly picketing at the plant premises. There were as many as 50 or 60 pickets in the morning, a lesser number in the afternoon, and at times there were as many as 100-150 men on the picket line. There were cursing, name-calling, stone-throwing, and efforts to overturn cars attempting to run the gauntlet of the pickets. A number of persons were hurt and had to be taken to the hospital. The Newark police tried to keep order, and the plant was under constant surveillance.
Meo was the target of constant threats. He testified that shortly after the strike started three union delegates came to his office and said that "if I knew what was good for me that I should close the plant down." He at once called in the Newark police. Meo said that when he would leave the plant with Bellomo to go home, two police motorcycle escorts would accompany them to the Newark boundary line, almost as far as *61 the New Jersey Turnpike. Twice striking employees attempted to run the company-owned car off the Turnpike.
On one occasion when Meo discussed the strike situation with Commercial Can's president, the latter stated that the Newark plant must be kept open despite any violence, and he would personally attend to anything that happened. Soon after the strike started Meo received a call from the president warning him to be careful, never to leave his home alone, and to ask the Fairview police for protection. Meo got in touch with the Fairview police chief and was provided with the necessary surveillance of his home. He received threatening phone calls at his home practically every night, telling him he had better shut down the plant if he knew what was good for him. A typical call was, "You dirty so-and-so; what are you trying to do, take bread and butter out of our mouths? We will get you yet. We are going to spill blood along the road." When his wife answered, the caller would hang up. There was a nightly average of four or five calls, and during the last week or so before he was attacked, he received almost a dozen calls a night.
On the morning of March 30, 1960 Meo arose at about 5:45, dressed and had breakfast, went to the garage, drove the company car out onto the driveway, and then waited for his son-in-law to come over from his home close by so that they could drive to the plant together. A green patch of lawn showing through the snow cover attracted Meo's attention. He got out of the car for a closer look, and as he was looking he heard footsteps, but paid no attention. Suddenly he heard someone say, "Here's the lousy scab," or "Here's that dirty scab." He remembered nothing further; when he regained consciousness he found himself in the Englewood Hospital. He had suffered a broken jaw, bruises to his back, injuries to his head requiring eight stitches, and the loss of three teeth, in addition to other injuries. He could not identify his assailants. Shortly before the attack his wife happened to look out of the kitchen window and saw three men running by, one with a baseball bat in his hands. She testified that she *62 knew that something was wrong, ran outside and, receiving no answer when she called her husband, then found him lying unconscious in a pool of blood, all battered. She had not seen the faces of the assailants, but said they were dressed in working jackets and that they had run to a car on the side street and driven away. Bellomo arrived on the scene moments later and found a wooden bat, some 1 1/2" in diameter and 2' long, lying close by Meo. He testified that as he was coming out of his home he noticed three young fellows come around the corner, but paid no particular attention to them at the time. He, too, was unable to identify any of them.
The company, here as below, states the issue to be, simply: "Does a workman, who is off duty, while leaving his home to go to work, and who is assaulted within the confines of his home, come within the purview of our Compensation Acts?" The matter is incompletely put, for it entirely lacks the frame of reference of the strike and petitioner's responsibilities in the strike setting. It likewise disregards his continuing prior experiences with relation thereto.
One or two preliminary matters should be disposed of before dealing with the core question of whether the injuries which Meo suffered are compensable. In the first place, there is no dispute that an assault may be deemed to be an "accident" within the Workmen's Compensation Act despite its willful or criminal nature. Cierpial v. Ford Motor Co., 16 N.J. 561, 566 (1954). Nor does the employer dispute that although Meo's assailants were not identified, an inference may reasonably and logically be drawn from the facts and circumstances that those who attacked him were strikers or men sympathetic to their cause.
The company concedes that Meo's injuries resulted from an accident arising "out of" his employment, but vigorously disputes that they arose "in the course of" the employment, and therefore are not compensable. In support of its position it relies heavily upon part of the text appearing in 1 Larson, Workmen's Compensation Law, § 29.21, pp. 447-448 (1952), and 1962 Supp., p. 218:
*63 "If a non-striking employee is assaulted by strikers on his way to [Enterprise Foundry Co. v. Industrial Accident Commission, 206 Cal. 562, 275 P. 432 (Sup. Ct. 1929)] or from [Lampert v. Siemons, [Siemons], 235 N.Y. 311, 139 N.E. 278 (Ct. App. 1923)] work, even if only two blocks from the employment premises [Walsh v. Russeks Fifth Avenue, 266 App. Div. 760, 41 N.Y.S.2d 145 (Sup. Ct. 1943)], he is denied compensation protection. Or if he is killed in a gun fight a mile-and-a half from the plant, the same result has been reached, although the strike was the sole occasion for the assault. [Merz v. Industrial Commission, 134 Ohio St. 36, 15 N.E.2d 632 (Sup. Ct. 1938)] Even when the employer promises special protection or assumes enlarged responsibility the statutory barrier has remained impermeable. In a New York case [Bannafoux v. Downtown Athletic Club, 268 N.Y. 657, 198 N.E. 543 (Ct. App. 1935), affirming 244 App. Div. 850, 279 N.Y.S. 629 (App. Div. 1935)], the employer furnished a detective escort to a non-striking baker during a city-wide strike. The detective's signal was three rings on the doorbell. One morning when claimant responded to this ring he was met and assaulted by strikers, and lost the sight of one eye. Compensation was denied. And in an English case [Poulton v. Kelsall, [1912] 2 K.B. 131, 81 L.J.K.B. 774, 106 L.T. 522] the employer's express agreement to assume responsibility for injuries to a non-striker was held ineffective to enlarge the compensation rights of a claimant assaulted by strikers seven minutes' walk from the employer's premises. Most extreme of all is a Scottish holding that even a strikebreaker injured by stones thrown at him could not recover compensation. [Murray v. Denholm & Co., 48 Sc. L.R. 896 (1911)]"
It will at once be observed that the cases cited to the text, and which we have set out in brackets, relate to a past day when courts generally, as indeed many courts still do, held that assaults occurring outside working hours or away from the place of employment were not compensable. The more modern view has long since broken through the barrier of the limited reasoning of these decisions.
The quoted text does not fairly represent Larson's thinking. In his view, there is no class of cases where the basic purposes of compensation law have so far miscarried as in the so-called "delayed injury" cases  work-connected assaults outside regular working hours. The most common examples are those growing out of strikes, and whether one choose to call the claimant a scab or a loyal employee, the fact is that he was assaulted solely because of the performance of his work. Larson *64 points out that looking at the matter from the employer's point of view, if ever an employee deserves compensation for his injuries, it is when he, at considerable personal risk, remains on the job to minimize damage and other loss that might be visited upon his employer. In every case where a court has refused compensation, it was because of the timing of the assault, "which might or might not bring it within the conventional boundaries of course of employment at the irresponsible whim of the assailant." Op. cit., § 29.21, pp. 446-448.
The author notes that sometimes a court is able to find special circumstances enabling it to surmount the "course of employment" obstacle. For example, the employee is attacked near the plant shortly after leaving work, as in Field v. Charmette Knitting Fabric Co., 245 N.Y. 139, 156 N.E. 642 (Ct. App. 1927), where Cardozo, J., found "continuity of cause * * * combined with contiguity in time and space," the ultimate test to be applied being whether "the quarrel from origin to ending must be taken to be one"; National Union Fire Ins. Co. v. Britton, 187 F. Supp. 359 (D.C.D.C. 1960); and see Baggett Transp. Co. v. Holderfield, 260 Ala. 696, 68 So.2d 21 (Sup. Ct. 1953) (claimant waited an hour before leaving the plant, but was pursued by strikers, overtaken a mile from the plant, and shot; compensation awarded). Or the assault occurred within the "zone of danger" created by the employment, Scott v. Industrial Commission, 374 Ill. 225, 29 N.E.2d 93 (Sup. Ct. 1940); A.N. Campbell & Co. v. Messenger, 171 Va. 374, 199 S.E. 511 (Sup. Ct. App. 1938). Or the employee was on 24-hour duty, housed by his employer near the plant, kept on continuous call, or under the employer's protection, Crippen v. Press Co., Inc., 228 App. Div. 727, 239 N.Y.S. 102 (App. Div. 1929), affirmed 254 N.Y. 535, 173 N.E. 584 (Ct. App. 1929); Malky v. Kiskiminetas Valley Coal Co., 278 Pa. 552, 123 A. 505, 31 A.L.R. 1082 (Sup. Ct. 1924).
We see no need to review the cases which have defined and redefined the statutory phrase "out of and in the course of" *65 employment, language used in most workmen's compensation cases. See R.S. 34:15-7. As Lord Wrenbury said almost half a century ago, these words "have been the fruitful (or fruitless source of a mass of decisions turning upon nice distinctions and supported by refinements so subtle as to leave the mind of the reader in a maze of confusion." Herbert v. Samuel Fox & Co., [1916] 1 A.C. 405, 419. The United States Supreme Court has characterized the phrase as "deceptively simple and litigiously prolific." Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469, 479, 67 S.Ct. 801, 91 L.Ed. 1028 (1947).
Courts early held that an accident arises "in the course of" employment if it occurs while the employee is doing what a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time  the definition adopted in Bryant, Adm'x. v. Fissell, 84 N.J.L. 72, 77 (Sup. Ct. 1913). And see the more recent case of Tocci v. Tessler & Weiss, Inc., 28 N.J. 582, 586-587 (1959). "In the course of" was sometimes referred to as "during" the employment and considered as dealing mainly with the element of time and space, or "time, place and circumstances." Giracelli v. Franklin Cleaners and Dyers, Inc., 132 N.J.L. 590, 594 (Sup. Ct. 1945). Looking for a simple rule, the courts soon invented the so-called "going and coming" rule, under which it was held that until an employee actually came onto the employer's premises he was not in the course of his employment  injuries received while on the way to or from work were not compensable. See Larson, op. cit., § 15.00 et seq., p. 194 et seq.; Gullo v. American Lead Pencil Co., 119 N.J.L. 484 (E. & A. 1938); Moosebrugger v. Prospect Presbyterian Church of Maplewood, 12 N.J. 212 (1953) (a 4-3 decision). As our Supreme Court recently pointed out in O'Brien v. First Camden Nat'l Bank & Trust Co., 37 N.J. 158, 162 (1962), the very generality of the "going and coming" rule inevitably spawned exceptions. And see Larson, § 15.12, p. 196 et seq. The exceptions have become so numerous that they "have now swallowed the rule." *66 Horovitz, "Workmen's Compensation: Half Century of Judicial Developments," 41 Neb. L. Rev. 1, 51 (1961).
Dean Roscoe Pound, in discussing Pribyl v. Standard Electric Co., 246 Iowa 333, 67 N.W.2d 438 (Sup. Ct. 1954), pointed out that if one had to classify the case under one of the recognized exceptions to the "going and coming" rule, it would not be difficult to do so: "It is time the `going and coming rule' and the endless distinctions for getting around it, which have grown out of it and darken counsel in plain cases, was given up." 15 NACCA L.J. 86-87 (1955).
What was said by Justice Francis in O'Brien v. First Camden Nat'l Bank & Trust Co., above, reflects the forwardlooking view that New Jersey courts have time and again in recent years exhibited in compensation cases:
"The various exceptions [to the "going and coming" rule] brought back into sharper focus the basic statutory test of compensability, that is, whether under the facts and circumstances of the particular situation the injury arose out of and in the course of the employment. Too easy reference to the subordinate going and coming precept manifestly pointed in the direction of injustice in particular fact complexes.
Application of this basic test to the facts in a given case must be engaged in with an appreciation of the beneficent social purpose of workmen's compensation. When so applied, if it can be said reasonably that the employee is serving an incidental interest of his employer at the time of injury, the right to compensation exists." (at page 163)
Further,
"The judicial obligation imposed by the Legislature to administer the Workmen's Compensation Act liberally to accomplish its beneficent purposes would be subverted by as extensive an application of the going and coming rule as is sought here. Legislation of this type cannot be given a too restricted construction either as to hours of service or premises of the employer or course of employment. * * *
We have no doubt that many hypothetical situations of varying factual content can be conjured up in an effort to appraise the outer limits of our holding here. Obviously, there can be no precise or all-inclusive articulation of those limits. The Legislature has established the broad boundary for determining compensability: Did the *67 accident arise out of and in the course of the employment? As has been said, the answer in each case depends on the particular facts when examined with an eye sympathetically focused upon the purpose the lawmakers sought to achieve. * * *" (at pages 164-165)
We have no hesitation in concluding, under the particular facts of this case, that Meo's assault occurred out of and in the course of his employment with Commercial Can. He was on 24-hour duty, and under express direction to keep the plant going at all cost. The area of his employment, and the strike area with it, extended beyond the Newark plant to and into his home in Fairview. What he was doing for his employer brought upon him threats of violence when he was at the plant, on the road home, and within the very confines of his residence. As plant superintendent in charge of production, as the man who defied every effort of the strikers to close the plant, as the person who hired new employees, he was an obvious target for strike violence. His employer knew of the employment hazard attending Meo from the very beginning of the strike at the Newark plant, and in fact warned him of the probability of violence and the necessity of getting police protection.
One is inevitably compelled to the conclusion that the conditions surrounding the labor dispute and the totality of circumstances attending Meo's employment made the assault upon him a natural incident of his work as plant superintendent and, as the county judge observed, a risk occasioned by the nature of his employment in behalf of management. The assault was directly related to his work and is therefore compensable.
There remains one minor observation. Counsel for the company, addressing himself to the fact that Meo had been furnished with a car by his employer, then states in his reply brief:
"* * * If the petitioner met with an accident while backing the car out of the garage, there is no question about the compensability. In this case, when he got out of the car, the petitioner left the sphere of his employment. * * *" *68 Accordingly, says counsel, the assault here is not compensable. The logic of this reasoning completely escapes us. If the line between compensability and non-compensability is to be drawn so finely that the assault would be compensable were petitioner sitting in the car, but not compensable if he had just gotten out of the driver's seat, then the Workmen's Compensation Act would indeed be construed to an illiberal and unjust end. We consider the above quotation as practically conceding compensability, if logic is to have any utility at all.
The judgment is affirmed.