407 F.2d 343
 Esther R. FOSTER, Individually and as Parent, Guardian and Next Friend of Jack N. Foster, Jr., Jerry Alan Foster and Joanne Lee Foster, Minors, Appellants,
v.
William L. MASSEY, Deputy Commissioner, and Safeway Trails, Inc., and Aetna Casualty & Surety Co., Appellees.
 No. 21480.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 7, 1968.
 Judgment filed May 29, 1968.
 Clarified Opinion filed September 24, 1968.
 Rehearing En Banc Denied October 14, 1968.
 
 Mr. William J. Fitzgerald, Washington, D.C., with whom Mr. Dennis Collins, Washington, D.C., was on the brief, for appellants.
 Mr. George M. Lilly, Attorney, United States Department of Labor, of the bar of the Supreme Court of North Carolina, pro hac vice, by special leave of court, with whom Mr. David G. Bress, U. S. Atty., Mr. Frank Q. Nebecker, Asst. U. S. Atty., Mr. Charles Donahue, Solicitor of Labor, and Mr. Alfred H. Myers, Attorney, United States Department of Labor, were on the brief, for appellee Massey.
 Mr. M. S. Mazzuchi, Washington, D. C., for appellees Safeway Trails, Inc., and Aetna Casualty & Surety Co.
 Before PRETTYMAN, Senior Circuit Judge, and WRIGHT and LEVENTHAL, Circuit Judges.
 ORDER
 Appellants' petition for rehearing is treated as a motion for clarification and, as so treated, is granted. The opinion previously issued is withdrawn, and the following clarified opinion is herewith filed.
 PRETTYMAN, Senior Circuit Judge:
 
 
 1
 This is a workmen's compensation case. It arises out of an accident in which appellant Foster's husband, on his way to work in his automobile, was injured and died. The Deputy Commissioner denied the widow's claim, on the ground "That the injury, and consequent death of the employer [sic], did not arise out of and in the course of the employment." She appeals from that determination.
 
 
 2
 The evidence was uncontradicted. We have examined it and find that it supports the findings.
 
 
 3
 Decedent was an "extra board" bus driver for Safeway Trails, Inc. The term means that as a bus driver he did not have a regularly assigned run but was listed on a bulletin board and subject to call to duty by the employer. An extra board operator was required to provide himself with telephone facilities in order that he might be called to service. The union agreement contemplated that he might be called six days a week. He had to be able to report to work in an hour and a half from the time he was called. At the time of a call the dispatcher informed the driver of the time to report and the place, which latter was either the bus terminal or a certain garage. If the driver did not respond or was not available to receive a call, he was subject to a disciplinary measure called a "miss out". These restrictions made it necessary that an extra board operator either be at home at all times, or leave a phone number where he could be reached, or continually call in to the dispatcher. A driver could call the dispatcher at any time and secure information as to the probability of a call that day.
 
 
 4
 The driver's pay began at the time named by the dispatcher as the time to report for work. As long as a driver was off duty and away from company property, the company had no jurisdiction over him whatever. An extra board operator, like other drivers, was paid on the basis of the number of miles he drove during the week. However, unlike regular drivers, the extra board operator received a guarantee of payment for 800 miles run a week, whether or not he drove that much, provided he was available to report six days a week. This was a guaranteed wage.
 
 
 5
 Decedent lived in a community in Maryland called Glen Burnie, near Baltimore. The terminal and the garage to which he reported were in the District of Columbia, over thirty miles away, a drive of about 45 minutes to an hour, depending on traffic. He had been with the company three and a half to four years.
 
 
 6
 On the morning of the accident (November 24, 1965) Foster called the dispatcher to inquire as to the possibility of a call and was told he would probably be used that afternoon. He was called at approximately 2:15 p. m. to report at four o'clock at the Washington Garage at 1905 Brentwood Road, N.E. Between two-thirty and three o'clock he called his wife to say he was on his way to work. The accident occurred in the 2800 block of New York Avenue, N.E., about a mile from the garage. Foster was in his own car and was driving a route selected by him. He was not on any special errand for the company.
 
 
 7
 It is well settled that, generally speaking, injuries sustained by employees going to or from work are not compensable under the workmen's compensation statute.[1]
 
 
 8
 Appellants argue that this case falls within any one of three exceptions to the general rule. The first exception is where the employee is paid for making the trip from home to work. Appellants say that the obligation of extra board operators to be available to call, to equip themselves with telephones, and to respond to calls are parts of the obligation for which the wage is paid. They say: "The actual act of response was a prerequisite to his earning that wage, and consequently Jack Neil Foster was earning it at the time that he met his death. This [the guaranteed wage] is payment for the act of responding." The argument is specious. Reporting for work is normally prerequisite to earning a wage. The coming-and-going doctrine would be stripped of all meaning by this view of appellants. We must note that the necessity for being available to call is not novel in the world of labor. To get a day's wage many workmen, both common workmen and expert tradesmen, such as carpenters, bricklayers, roofers, et al., must respond to a call. Weather and the amount of work available on a given day are fluctuating factors in many fields. And to receive a call by phone is not different in principle from receiving it at a designated place, a hiring hall or a street corner.
 
 
 9
 To establish this trip-payment exception, pay must be specifically identified as related to the trip or to the time spent going to the job site. The prescription for compensability under this statute is "arising out of and in the course of employment". While the statute is broad and liberal in its application, its benefits are definitely derived from employment. Usually the trip between home and work lacks all the characteristics of employment (time, place, pay, and employer control), but if there is pay for the trip this thin link is deemed sufficient to bring the trip within the boundary of employment and thus of accident compensability. But obviously, in order to constitute such a link, the identification of pay with trip must be specific and certain. It is not enough that before the trip begins workers are on call rather than on fixed schedules, or to argue in the abstract that overall compensation takes account, as a background fact, of the inconvenience of being on call rather than being on a fixed schedule. Fixed schedules are frequently quite inconvenient. The necessity to report for work at a designated place at a fixed hour five days a week is definitely restrictive in many ways, such as place of residence, hour of rising, hour of evening meal, out-of-town trips, time, place, nature and amount of amusements, etc. But restrictions do not transmute into employment the activity or time thus restricted, or make injuries arising therefrom or in the course thereof compensable under this statute.
 
 
 10
 Whenever an employer's location is such that going to work is time-consuming for a significant portion of the available labor force, this is a place disutility, in economic terms, that doubtless shows up, one way or another, in higher wages or offsetting benefits. But such background considerations do not provide the specific identification of pay to the trip which is necessary to establish compensability for injuries suffered en route to work.
 
 
 11
 A wage such as this guarantee could be paid for some purpose other than its ostensible one of making the basic job more attractive, but certainly in the present case that purpose was not to pay the employee for the trip to and from his home. In the first place, neither the contract of employment nor the union contract contains provision for pay for that purpose. In the second place, no reason appears why extra board operators should be paid for the trip to and from home while regular operators were not. The argument presumes such a discrimination; the argument assumes that the guarantee, which regular drivers did not receive, was pay for the trip. Foster's circumstances by no means required the Commissioner to find that he, unlike other employees who are generally on call, had a special schedule of compensation for on-call service. As we have pointed out, there are no facts on the record to indicate that the guarantee agreement was other than compensation assured in the absence of work done as a security to make the overall compensation arrangements attractive. In the absence of such security, the employer might have had to offer higher wages per mile run. Surely appellant could not argue that on-call services were being compensated in some weeks and not in others depending on whether the 800 miles' driving time was reached in the week.
 
 
 12
 The second exception to the general doctrine is where the employer controls the trip. Appellants say that, since this employer customarily gave this employee an hour and a half notice and the trip from the employee's home to the place of employment normally took from forty-five minutes to an hour, the employer left no choice of route but required use of the most direct one. Thus, they say, the entire operation was controlled by the employer. This argument borders on the frivolous. Besides obvious fallacies, we note that the record does not show that Foster was at home when he received the call,[2] or that he was on the most direct route to work, or at what time he actually started to drive, whether he gave himself plenty of time or whether he planned on a fast trip.
 
 
 13
 The third exception posited by appellants is where the employee is on a special errand for the employer. Appellants say, "In every case in which they were called, it was because of some extra mission which had to be performed," and they cite the need for extra buses due to unusual loads, illness of a regular driver, breakdowns, emergencies, special excursions, "and so forth," as special errands. The short answer to the argument is that the incidents mentioned are part of the routine operation of this business. They are part of normal employment. Appellants say, "Everything he did in response to that call furthered the employer's interest by performing whatever special errand it was the employer had called him to perform." The only errand the company called Foster to perform, so far as the record shows, was to drive a bus. Any bus-driving furthered the company's interest.
 
 
 14
 The record in the present case depicts normal basic practices. The company fixed the place of employment and the time for reporting to work. These are normal functions of an employer. Normally pay begins when the employee reports to work.
 
 
 15
 Of course in a sense a person is "employed" so long as he has a job; he is not unemployed. But that generality is not applicable to the statutory provision now before us. The time of beginning a day's "employment", within the meaning of the statutory phrase, usually is when the employee goes "on duty". It is fixed by the same considerations whether the pay is determined upon a day-to-day basis (day's wages), upon a minimum guarantee, or as a salary. Generally a person on salary is not considered to be in the course of "employment" 24 hours a day; rather the employment begins when he reports for work and ends when he leaves his work situs. A person working regularly on a five-day week is not unemployed two days a week, but at the same time he is not in the course of employment in this statutory sense during those two days. A person who works for a daily wage is not "employed" when he has no work or fails to go to work. He is employed when he gets a call for work and reports. The same reasoning applies to a guaranteed wage. There is no exception to preclude application of these general premises to the case of an extra board driver. His pay begins when he goes "on duty"; he is then "employed".
 
 
 16
 While the Commissioner did not spell out the guiding principles as extensively as we have done, he did make clear the crucial determination, that, in general, employment begins with reporting for work, and we may fairly presume that his overall approach is along the lines we have set forth.
 
 
 17
 Our function in these cases is strictly limited. If the findings are supported by substantial evidence, and if the conclusion is not irrational and the order is not forbidden by law, the decision is to be sustained.[3] We have stated that the findings here are in our judgment supported by ample evidence. We do not find the Deputy Commissioner's conclusion irrational or forbidden by law.
 
 
 18
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 See Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947); Voehl v. Indemnity Ins. Co., 288 U.S. 162, 53 S.Ct. 380, 77 L.Ed. 676 (1933); Clark v. Commercial Casualty Ins. Co., 95 F.2d 58 (5th Cir. 1938); Morgan v. Hoage, 63 App.D.C. 355, 72 F.2d 727, cert. denied, 293 U.S. 606, 55 S.Ct. 122, 79 L.Ed. 697 (1934); New Amsterdam Casualty Co. v. Hoage, 60 App.D.C. 40, 46 F.2d 837 (1931)
 
 
 [2]
 Indeed it indicates the contrary, since it shows he called Mrs. Foster to tell her he was on his way to work
 
 
 [3]
 O'Keeffe v. Smith, Hinchman and Grylls Associates, 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965); O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951); Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947)
 
 
 
 19
 J. SKELLY WRIGHT, Circuit Judge (dissenting):
 
 
 20
 Assuming that the continued vitality of the so-called "going and coming" rule is as certain as the court's opinion suggests, I would still hold that the facts of this case, as stated by the court, take us outside the rule. I am influenced, of course, by this court's repeated affirmation of the presumption of compensability in questionable cases and the liberal application required by the underlying philosophy of the Act. See Wheatley v. Adler, 132 U.S.App.D.C. ___, 407 F.2d 307 (decided May 17, 1968) (en banc). Compare United States v. Charles, 130 U.S.App.D.C. 151, 397 F.2d 712 (1968) (per curiam).
 
 
 21
 I respectfully dissent.