**MID-GULF STEVEDORES, INC.,**
Employer
and
Argonaut Insurance Company, Insurance
Carrier, Plaintiffs,

v.

**Raymond E. NEUMAN et al., Defendants.**
**Civ. A. No. 69-2680.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Oct. 21, 1971.

---

Max Zelden, Zelden & Zelden, New Orleans, La., for Frank McCray, intervenor.

Lawrence L. McNamara, Adams & Reese, New Orleans, La., for employer, Mid-Gulf Stevedores, Inc., and for insurance carrier, Argonaut Ins. Co.

John R. Schupp, Asst. U. S. Atty., New Orleans, La., for Raymond E. Neuman, Deputy Com'r, United States Dept. of Labor.

## OPINION

R. BLAKE WEST, District Judge.

This is an action to suspend and set aside the compensation order rendered by

the defendant, Raymond E. Neuman, Deputy Commissioner, Bureau of Employees' Compensation, United States Department of Labor, 7th Compensation District, in case number 7–10702, entitled "Frank McCray versus Mid-Gulf Stevedores, Inc. and Argonaut Insurance Company".

The suit arises out of an alleged injury suffered by longshoreman Frank McCray, the compensation claimant in the aforesaid proceeding, who became incapacitated while aboard the SS INDIAN RELIANCE on January 27, 1966. After hospitalization, his condition was diagnosed as a cerebral vascular thrombosis with right-sided hemiplegia. Upon conclusion of an evidentiary hearing, the Deputy Commissioner held that conditions of McCray's employment had precipitated or hastened the thrombosis, and Mid-Gulf was held liable in compensation.

Mid-Gulf consequently filed this suit against the Deputy Commissioner urging that his decision should be set aside.[1] Suit was answered by the United States on behalf of Mr. Neuman, and McCray was permitted to intervene.

The standard of review in cases of this sort was provided by the United States Supreme Court in O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc., 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965):

> "The rule of judicial review has therefore emerged that the inferences drawn by the Deputy Commissioner are to be accepted unless they are irrational or 'unsupported by substantial evidence on the record * * * as a whole'. O'Leary v. Brown-Pacific-Maxon, Inc., supra, 340 U.S. at 508, 71 S.Ct. 470, 95 L.Ed. at 487."

■ *O'Keefe* apparently sets forth two standards for reviewing, stated disjunctively. The reviewing Court must uphold the Deputy Commissioner unless his findings are irrational *or* unsupport-

ed by substantial evidence. However, (assuming there is a meaningful difference between "irrational" and "unsupported by substantial evidence") if either concept exists, the conclusions of the Deputy Commissioner are not to be accepted.

On the basis of the foregoing rules, considering this matter as an appeal on the record by Mid-Gulf, and after a careful and exhaustive review of the testimony given at the Deputy Commissioner's hearing, and of the record as a whole, the Court is compelled to hold that the findings of the Deputy Commissioner are not supported by substantial evidence. It is evident from the record that the conclusions of the Deputy Commissioner do not rationally follow from the evidence upon which they are based.

■ The Court recognizes that its "function in these cases is strictly limited", Foster v. Massey, 132 U.S.App.D.C. 213, 407 F.2d 343 (1968). Nevertheless, the Court is charged with the responsibility "for assuring that the Board keeps within reasonable grounds". Universal Camera Corporation v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ The Court is aware that " * * the burden is on the petitioner to show that the evidence adduced at the hearing does not support the Commissioner's findings of fact". T. Smith & Sons, Inc. v. Donovan, 227 F.Supp. 640 (E.D. La., 1964). In the Court's opinion, petitioner has amply borne that burden.

It is undisputed that the claimant, Frank McCray, suffered a cerebral thrombosis on January 27, 1966 while he was a longshoreman in the employ of Mid-Gulf Stevedores. The question to be resolved by the Deputy Commissioner was whether claimant's cerebral thrombosis was caused in any way by the conditions of claimant's employment and whether such thrombosis was an "injury" in accordance with the provisions of the Act.[2]

---

1. Pursuant to Section 21(b) of the Longshoremen's and Harbor Workers' Act, 33 U.S.C. Section 921(b).

2. Pursuant to Section 3(a) of the Longshoremen's and Harbor Workers' Act, 33 U.S.C. Section 903(a).

The evidence reveals that McCray reported for work aboard the SS INDIAN RELIANCE on January 26, 1966 to work the night shift from 6:00 o'clock to midnight. McCray also reported the next morning, January 27th, at 8:00 o'clock a. m. to work the day shift. After the lunch break on the 27th, McCray apparently suffered a stroke aboard the vessel and his condition was later diagnosed as cerebral-vascular thrombosis with right-sided hemiplegia.

On the dates in question, the longshoreman crew of which McCray was a member was assigned to unload general cargo consisting of pasteboard boxes containing cans of pineapple and bales of rubber. Testimony on the point was elicited from Isaac Jones, the claimant's work partner, and from David Markey, the claimant's foreman. Both witnesses stated consistently that the work in which the crew was involved was not strenuous. The crew moved the boxes of pineapple by use of a dolly and a pallet board. As for the bales of rubber, the crew had only to attach a hook to the bales which were lifted by use of a winch. There was no testimony whatsoever that the crew or the claimant was required on either the 26th or the 27th to perform heavy lifting. To the contrary, *all* of the testimony was to the effect that the work was not strenuous.

There was conflicting testimony on McCray's condition when he reported for work on the evening of the 26th. Jones stated that the claimant appeared to be allright; Markey stated that McCray exhibited signs of being "dizzy" or "hungover". Regardless, it is clear that at some time during the night shift on the 26th McCray began to weaken. Isaac Jones testified in this way:

"Q. How long was it into the shift would you say before you noticed that Frank McCray wasn't holding his end of things?

A. Well, I would say about two or three hours after we started to work that he began to, he just wasn't handling the cargo like he should.

Q. And thereafter you all carried him, is that right?

A. Yes, sir, we carried him." (Tr. 20–21).

Jones' testimony concerning January 27th was essentially the same:

"Q. And isn't it a fact on that morning that your crew again carried him and that he didn't do any work that day?

A. We carried him.

Q. So the answer to my question is yes?

A. Yes, I would say that." (Tr. 21–22).

The testimony that McCray was "carried", i. e., that the rest of the crew took up the slack and did his work for him, was essentially verified by foreman Markey's responses:

"Q. Well, let's clarify that. On the 27th, this is the second shift, did he work at all?

A. Very little, Frank was in and out of the head and he was standing by the hatch and he would go off and come back and maybe be there for ten or fifteen minutes and go off again.

Q. On the 26th he worked very little?

A. It was the same way at night.

Q. And the work that his crew was assigned to do was not strenuous work?

A. No, I can't say it was strenuous in no respect at all." (Tr. 78).

Only the claimant himself denied that he was carried by the crew. It is difficult to believe that McCray's testimony was relied upon by the Deputy Commissioner who remarked in this regard:

"Undoubtedly, Mr. McCray is confused." (Tr. 195).

The Deputy Commissioner further commented:

"I think it is pretty obvious he cannot recall things too well." (Tr. 196).

In view of the consistent testimony of Jones and Markey, and in view of the Deputy Commissioner's comments, the evidence substantially shows that the

claimant was "carried" by his crew for significant periods of time on both the 26th and 27th. The point was not referenced in the Findings of Fact of the Deputy Commissioner, but there is no evidence in the record to indicate that he would have found otherwise.

In summary of the testimony regarding the nature of the claimant's work on the 26th and 27th, it is clear from the record that McCray did little work on those dates, and that what work he did do was not strenuous in any respect. Upon the establishment of these facts, it is necessary to determine whether those conditions of the claimant's work caused his stroke.

A considerable amount of medical testimony was given in regard to the cause of the claimant's cerebral thrombosis. It was undisputed, and the Deputy Commissioner found as a fact, that the claimant had arteriosclerosis for some undetermined time prior to January 26, 1966. It was stipulated that McCray was hospitalized for treatment of a cerebral concussion in 1952.

The testimony of four doctors was given regarding claimant's physical condition and the causes thereof. Dr. Anthony J. Hackett treated McCray at Flint-Goodrich Hospital during the first two weeks of March in 1966. Dr. Hackett did not offer an opinion as to the cause of McCray's condition because he did not believe he was properly qualified in that particular field.

Dr. Victor Henry was qualified as a medical expert in the capacity of general practitioner. Dr. Henry treated the claimant on January 27, 1966, the day that the claimant suffered a cerebral thrombosis. It was Dr. Henry's opinion that McCray suffered a cerebral vascular accident which occurred very suddenly within hours before he treated McCray on the 27th. As to the cause of claimant's condition, Dr. Henry testified:

"Q. Isn't it your opinion, Dr. Henry, that this man's work had nothing to do with the cerebral thrombosis?

A. This is an opinion that I have unless someone can show me differently or from what I have read, I base my opinion mainly on the thousand cases of cerebral vascular thrombosis. It was extensively studied by Cornell Bellevue Hospital in New York, and of all the etiological causes for cerebral thrombosis, work is not listed as one.

Q. Isn't it also your opinion that the cerebral thrombosis was simply the natural result of this man's aging, growing older?

A. Yes." (Tr. 99–100).

Dr. Murrel Kaplan was qualified as an expert in the field of internal medicine. Dr. Kaplan examined the claimant on June 7, 1969. Dr. Kaplan was of the opinion that the performance of longshoreman's work *could* be a contributing factor to a cerebral thrombosis. Dr. Kaplan testified as follows:

"Q. As it has been alleged in this particular case, this man was employed as a longshoreman, that during the course of his employment when he was performing a type of work which he was normally adjusted, and used to working in the hold of a ship, he suffered a cerebral vascular accident from which he is suffering at the present time. Given his pre-existing physical condition, would his work on this particular day, could this work on this particular day have been a contributing factor to the cerebral vascular accident?

A. Yes, I think so." (Tr. 127–128).

Counsel for claimant pursued this line of questioning with a hypothet involving "very heavy labor".

"Q. Doctor, isn't it true a man may be doing a particular job that he does, very heavy labor, day after day and week after week and during all this time the plaques are building up and building up and eventually he is going to reach one day, although he is doing the same thing he was doing before, that the plaques that build up to such a degree that the stress and strain of

what he is doing would be sufficient to form the formation of a clot?

A. Well, it doesn't necessarily hold that he has to have it.

Q. But, he can?

A. But he can have, certainly. I think it is much more likely in a man with diseased blood vessels than it is with a normal individual with normal blood vessels." (Tr. 128–129).

The hypothetical question presented above utilized the term "very heavy labor". There was, as previously stated, no evidence that the claimant was performing heavy labor; all of the evidence was to the effect that the little work that he did was not strenuous. However, even when assuming by the hypothet that McCray had performed "very heavy labor", he could not with certainty testify that the work was a contributing factor:

"Q. By the use of hypothetical situation you answered Mr. Zelden's questions about whether or not work was a contributing factor, saying it could be but you did not say that it was?

A. I did not say that it had to be, no." (Tr. 133).

In summary of Dr. Kaplan's testimony, he was of the opinion that a usual amount of strain can be a contributing factor in causing cerebral thrombosis. However, he was unable to say with certainty that the claimant's work contributed to his cerebral thrombosis in this case.

Dr. Sam Nadler was qualified as an expert in the field of internal medicine. Dr. Nadler examined the claimant 1½ days after he suffered the cerebral thrombosis in January, 1966, and later examined the claimant a few days prior to the Commissioner's hearing. Dr. Nadler was of the opinion that the claimant's working conditions did not cause his cerebral thrombosis:

"Q. Now, Doctor, in your opinion and based on your findings, and you were aware of the type of work in which Mr. McCray was engaged?

A. Yes, he worked at the job of physical labor, I understand, and that he worked at unloading ships and that sort of thing.

Q. Now, Doctor, is it your opinion that Mr. McCray's work contributed to or aggravated or precipated the cerebral thrombosis?

A. When you ask me this question, I would like to answer first no and then qualify my answer because I think the air has to be cleared as to why I feel this is so." (Tr. 158).

Dr. Nadler next provided a lengthy narrative explanation of the causality and symptomology of cerebral thrombosis. Dr. Nadler commented specifically in regard to the claimant's condition:

"Now this man's artery process manifested itself in 1966 with the development of the end result of that process in that particular artery and that particular portion of his body resulting in a cerebral thrombosis. Now this can go on whether a man is lying in bed, is a white collar worker—as a matter of fact, it is presumed to be of higher incidence in the worrying types of occupations and white collar workers than in laborers. This is not a disease having to do with physical activity." (Tr. 160).

Dr. Nadler concluded his testimony by stating that only a very unusual physical effort might precipitate cerebral thrombosis:

"Now these I have tried to lay out the reasons for my making or coming to conclusion that no, work did not have anything to do with the precipitation of his thrombosis unless there is evidence that he was called upon to do something very unusual or very different from his usual occupation. I don't mean just being at work, but doing something that was really different for him.

"I can think of certain instances where in the holds of ships, for example, noxious gases have been allowed to escape from tanks where men had to

climb up four or five flights of ladders very rapidly. This would be an unusual kind of effort even for a heavy worker, but as I said originally, I had the impression from his wife that he had felt well when he was going to work. She said nothing about any different kind of work. I am not aware if there was such an unusual effort. In the absence of such knowledge, I would say no, the work did not produce his cerebral thrombosis." (Tr. 163).

Dr. Nadler's testimony was consistent on the point that "work itself does not produce the degenerative process."

■ In summary of the medical testimony, three doctors testified regarding the general causality of cerebral thrombosis. Dr. Henry, who treated the claimant on the day he suffered the stroke testified that in his medical opinion the claimant's work had nothing to do with his cerebral thrombosis. Likewise, Dr. Nadler was of the opinion that the claimant's work did not contribute to, aggravate, or precipitate the cerebral thrombosis. Dr. Kaplan stated that a usual amount of work can be a contributing factor in causing cerebral thrombosis, but he was unable to testify that in the instant case the claimant's work caused his stroke. The record, therefore, is totally without clear medical opinion testimony that McCray's cerebral thrombosis was caused or aggravated by his work; to the contrary, two of the doctors clearly rendered the opposite opinion, that the claimant's work had nothing to do with his stroke. In view of the foregoing, it is the opinion of this Court that there is no substantial evidence to support the Deputy Commissioner's finding that McCray's work precipitated his cerebral thrombosis. It is the further rational conclusion to be drawn from the evidence that, to the contrary, the claimant's stroke was not caused by his work.

The Court is aware that "(w)ith respect to any conflict in the medical testimony offered by the parties, the Commissioner is not bound to accept the opinion or theory of any particular medical examiner." Jackson v. Neuman, 309 F. Supp. 697 (E.D.La., 1970). The rule has no application here, however, because there was no genuine conflict of opinion among the medical experts. Not a shred of testimony conclusively linked the claimant's physical condition to his work. On the other hand, two doctors were able to testify without reservation that the claimant's cerebral thrombosis was not work-related, and that testimony was the *only* expert opinion bearing on the specific cause of McCray's condition.

It is with a great deal of reluctance that this Court denies recovery to the claimant. McCray's disability is total, and the review of the record in this matter compels genuine sympathy for the claimant. Such emotion, however, cannot be considered in determining the rights of the parties.

■ What is to be considered is the evidence from which the Deputy Commissioner drew his findings. The Court's review cannot " * * * be a mere rubber-stamping of the Deputy Commissioner's order when the reviewing Court is unable to conscientiously conclude that the evidence supporting such decision is substantial". Goins v. Noble Drilling, 397 F.2d 392 (5 Cir., 1968). The Court cannot rationally conclude that the Commissioner's findings were supported by substantial evidence and, for the reasons set forth above, it is ordered that the compensation order be set aside and that the motion of the plaintiff, Mid-Gulf Stevedores, for summary judgment, be and the same is hereby granted. The Clerk of Court is ordered to enter a judgment accordingly.