### EVENING STAR NEWSPAPER COMPANY, Petitioner,

v.

**Phyllis KEMP and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

### No. 74–2132.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1975.

Decided March 26, 1976.

Rehearing Denied April 30, 1976.

George M. Lilly, Atty., U. S. Dept. of Labor, Washington, D. C., was on the brief for respondent Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor.

Joseph H. Koonz, Jr., Washington, D. C., for respondent Phyllis Kemp.

Before DANAHER, Senior Circuit Judge, LEVENTHAL, Circuit Judge and VAN PELT,* United States Senior District Judge for the District of Nebraska.

Opinion for the Court filed by Senior District Judge VAN PELT.

Dissenting opinion filed by Senior Circuit Judge DANAHER.

VAN PELT, Senior District Judge.

The petitioner, Evening Star Newspaper Company (Evening Star), seeks reversal of an order awarding to the widow of an employee, compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* as made applicable to the District of Columbia by the District of Columbia Workmen's Compensation Act, D.C.Code 1973, § 36–501 *et seq.* Following an evidentiary hearing the Administrative Law Judge found for respondent widow. This ruling was affirmed by the Department of Labor's Benefits Review Board. We affirm.

The basic issue presented in this appeal is whether the decision of the Administrative Law Judge and the Benefits Review Board that the injury arose out of and in the course of the decedent's employment is supported by substantial evidence and is not inconsistent with the applicable law.

The decedent, Nathan Kemp, was employed by the Evening Star as a truck driver delivering newspapers. He also owned a taxicab which he operated part-time.

On August 10, 1971, while Mr. Kemp was on pay status with the Evening Star, he was killed by a gunshot wound under the following circumstances:

Kemp had returned from his first delivery run at about 3:30 p. m. on that day. He

John E. Rogers, Washington, D. C., with whom Richard W. Turner, Washington, D. C., was on the brief for petitioner.

Ronald E. Meisburg, Atty., U. S. Dept. of Labor, Washington, D. C., with whom

* Sitting by designation pursuant to 28 U.S.C. § 294(d)

was not due to make another run until 4:25 p. m. Thus he had approximately one hour in which he could do as he pleased. However, he was still on pay status ("on the clock"). From employee Ward he learned that his taxicab, which was parked in a lot one-half block from the Star building, had been hit. Ward suggested to Kemp getting Andrews, who was another "on the clock" driver and who did body work. All three then walked over to the lot to check out the accident.

Andrews looked at the dent in the taxicab and stated that if he had a rubber mallet he could fix it enough for Kemp to get through inspection. Kemp got the gun out of the car and Ward and Kemp began playing with the gun. The three men then left in the taxicab to go to the New Star Garage about three blocks away to get the rubber mallet. It is not clear whether decedent placed the handgun back in the trunk or placed it under the seat of the taxicab.

While at the garage, Andrews began working on the car and the other two men again got the gun out. It is unclear whether Ward or the decedent got the gun out of the car the second time. In the course of handling the gun, it went off while Ward was holding it. Ward's testimony was: "And like I had the gun in my hand, and he said, Oh, man, come on, let's stop this playing. And he made a motion towards me and hit my hand and the gun went off." Mr. Kemp was killed by the shot.

At the hearing before the Administrative Law Judge there was testimony that the decedent carried the gun because he was afraid of being robbed in his taxicab and because he was afraid of things that might happen while he was driving the Evening Star's delivery truck. He had carried the gun on at least one delivery trip and his wife a couple of times noticed that he was carrying the gun when she went to the Evening Star building to pick up his pay check. There was also testimony that other Evening Star drivers had been called names or had been threatened on their delivery runs. However, none carried guns on their trucks, although some carried them in their cars.

The drivers were required to deliver papers into some rural areas and were sometimes required to carry money for the company. The trucks they drove were very similar to the trucks regularly used to carry the Evening Star's money.

Evidence was also presented at the hearing concerning the "free time" the drivers had between their runs. During this time they remained "on the clock" for pay computation but were allowed to leave and do whatever they wanted. Frequently the drivers were required to go to the garage, the scene of the accident, for various employer-related reasons. On occasion the drivers had gone to the garage to work on their private automobiles, to consult with the Evening Star's mechanics about such automobiles, and to borrow tools. The Evening Star's supervisory personnel were aware of these activities and permitted them to occur.

Based on these facts, the Administrative Law Judge awarded compensation and the Benefits Review Board agreed with such order.

■ We must consider two basic rules in deciding this appeal. The first concerns the scope of judicial review. It is well-settled that if the Administrative Law Judge's decision is supported by the evidence as a whole and is not inconsistent with the law, it should be upheld. *Cardillo v. Liberty Mutual Co.,* 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947).

"The rule of judicial review has therefore emerged that the inferences drawn by the Deputy Commissioner [Administrative Law Judge] are to be accepted unless they are irrational or 'unsupported by substantial evidence on the record . . . as a whole.' *O'Leary v. Brown-Pacific-Maxon, Inc.,* supra, 340 U.S. [504] at 508 [71 S.Ct. 470 at 472, 95 L.Ed. 483]." *O'Keefe v. Smith, Hinchman & Grylls Assoc. Inc.,* 380 U.S. 359, 362, 85 S.Ct. 1012, 1014, 13 L.Ed.2d 895, 898 (1965). *Accord, Wheatley v. Adler,* 132 U.S.App. D.C. 177, 407 F.2d 307 (1968); *Potenza v.*

*United Terminals, Inc.,* 524 F.2d 1136 (2nd Cir. 1975); *Nardella v. Campbell Machine, Inc.,* 525 F.2d 46 (9th Cir. 1975).

■ The second rule is the strong legislative [1] and judicial policy favoring awards in workmen's compensation cases.

> "Our review must also take account of the settled rule that the Act is to be construed with a view to its beneficent purposes. Doubts, including the factual, are to be resolved in favor of the employee or his dependent family." *Friend v. Britton,* 95 U.S.App.D.C. 139, 141, 220 F.2d 820, 821 (1955).

*Accord, O'Keefe v. Smith, Hinchman & Grylls Assoc. Inc., supra* ; *Wheatley v. Adler, supra* ; *Strachan Shipping Co. v. Shea,* 406 F.2d 521 (5th Cir. 1969).

■ We conclude that the Administrative Law Judge's finding that the decedent's death resulted from injuries sustained in the course of and arising out of his employment is supported by substantial evidence, and that, under the rules just mentioned and the cited portion of the Act, we should affirm the Benefits Review Board.

The decedent was injured during an enforced lull, which was a condition of his employment. His presence at the Star Garage was not against company policy. On the contrary, it was acquiesced in by the employer.

Viewing the facts in a light most favorable to decedent and his widow, it appears that he was killed by a fellow employee who was handling the decedent's personal handgun. At the time decedent was on pay status with the Evening Star and was on the sidewalk adjacent to the employer's premises. The handgun was carried for the decedent's personal protection as well as for protection of the employer's property. The handling of the gun was instigated by the fellow employee, and the accident occurred when the decedent attempted to stop the activity. The evidence does not show that the two were engaged in reckless, irresponsible "horseplay." [2]

Although it is true that an employer should not be held liable for an accident that results from a "new and added peril to which the employee by his own conduct has needlessly exposed himself", *Monahan v. Hoage,* 67 U.S.App.D.C. 174, 176, 90 F.2d 419, 421 (1937); *Penn. Stevedoring Corp. v. Cardillo,* 72 F.Supp. 991, 993 (S.D.N.Y.1947), *aff'd,* 165 F.2d 789 (2d Cir. 1948), the enforced lull in this case sheds a different light on the facts of the accident. The enforced lull was a part of that employment. If the employees engaged in an activity that hindsight proves was lacking in reasoned thought, so long as it was not illegal, the employer cannot be heard to complain. The employees cannot be expected to remain idle during this time. It is to

---

1. "In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary

   (a) That the claim comes within the provisions of this chapter.

   . . ." Longshoremen's and Harbor Workers' Compensation Act, § 20(a); 33 U.S.C. § 920 (1972).

2. It may make little difference whether the two were engaged in "horseplay" or not. During an enforced lull, it is to be expected that workers will engage in some careless and reckless behavior. Such "expressions of human behavior" should be accepted as part of the risk of enforced lulls and as such should be considered, when accidents result, to be in the course of and arise out of the employment. *See, Hartford Accident & Indemnity Co. v. Cardillo,* 72 U.S.App.D.C. 52, 112 F.2d 11, *cert. denied,* 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed.

1415 (1940). In that case, then Judge Rutledge pointed out:

> "Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional makeup. In bringing men together, work brings these qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flare-up. Work could not go on if men became automatons repressed in every natural express. 'Old Man River' is a part of loading steamboats. These expressions of human nature are incidents inseparable from working together. They involve risks of injury and these risks are inherent in the working environment." *Id.* 72 U.S.App.D.C. at 56, 112 F.2d at 15.

be expected that they will engage in activities that will relieve their boredom. *See Hartford Accident & Indemnity Co. v. Cardillo, supra.* Unless the activity is so totally unreasonable that it severs the employee's connection with the employer, any accident resulting therefrom should be considered as sustained in the course of and arising out of the employment.

The ultimate question is whether the fact that a gun was involved in the accident in this case works such a severance. Had the injury been sustained in, say, a brawl wherein some ready-to-hand weapon was used, like a pipe, the employer would obviously be liable under the holding of *Hartford Accident.* The result is not changed because decedent's death was due to the discharge of his gun, provided there was an employment nexus for the gun, the injury occurred on the employer's premises during work-time, and decedent was not the instigator of the fatal gun handling. As to the employment nexus, the findings of the Administrative Law Judge (ALJ) establish that the availability of a gun was not unrelated to the hazards of the job.[3] These findings are part of the whole record, even though the Benefits Review Board did not think it necessary to consider, as the ALJ had done, whether this constituted a "zone of special danger." The analysis cannot be over-fragmented. We are faced with a composite: a job with some dangers and the need of a company for men willing to face these, which leads us to men also serving as taxi drivers. We are aware of the fact stressed by our dissenting colleague,

that decedent had already taken one run in a truck without a pistol, but this did not negate the possibility that another assigned run, after a waiting period, might involve a function (being given money to turn in), time, or route that would lead him to carry a gun in the truck.. The gun did not provide an automatic severance from employment—as may be established by saying we think it plain, and we do not understand the employer to contest, that there would be compensation if the gun had remained in the truck and had been discharged accidentally upon the trunk being pounded at the garage by means of a mallet. The additional facts that the gun was withdrawn from the taxi cab and the accident arose from ensuing handling of the gun during an "enforced lull" do not defeat compensation. The statutory scheme is to remove from the determination of compensability considerations of contributory fault falling short of injury "occasioned solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another." 33 U.S.C. § 903(b). As Judge Rutledge put it, "the Act's fundamental policy in departing from fault as the basis of liability and of defense, except as specified, is inconsistent with any notion that recovery is barred by misconduct which amounts to no more than temporary lapse from duty, conduct immediately irrelevant to the job, contributory negligence, fault, illegality, etc., unless it amounts to the kind and degree of misconduct prescribed in definite terms by the Act." *Hartford Accident & Indemnity Co. v. Cardillo; supra,* 72 App. D.C. at 58, 112 F.2d at 17.

3. The credible evidence in the instant case shows that the decedent had a gun in his car and sometimes carried it while driving a truck because he was apprehensive about robbery or assaults. Both he and other drivers had been subjected to menacing language, there had been robberies in the community, and one witness had been threatened by a gun while driving the Employer's truck on the highway. The decedent occasionally was given money to turn in to the company, which had a 24-hour depository in the Star building. He also occasionally drove at night in outlying areas. Routemen of the Employer regularly collected and transported money, and their trucks were indistinguisha-

ble from delivery trucks used by the decedent. Some of the other company drivers were also apprehensive and kept guns in their cars, but not in their trucks. The Employer had no published regulations prohibiting the possession of guns, and no prohibition had ever been communicated to the decedent. From all of the evidence it may reasonably be inferred that the gun in question was carried for the decedent's personal protection and for the protection of the Employer's property during the course of his employment, because of a "zone of special danger" arising out of the conditions and circumstances of this employment.

It is unnecessary for this court to say how it would have decided the case in the first instance. It need only evaluate whether the administrative decision was arbitrary or capricious or unsupported by substantial evidence. A review of the record here supports the conclusion that plaintiff's evidence can be termed substantial.

Resolving doubts in favor of the employee we conclude that the Review Board's determination should stand. Therefore, we affirm.[4]

DANAHER, Senior Circuit Judge (dissenting):

An Administrative Law Judge (herein, ALJ) entered an order that The Star, our appellant, pay to the Claimant compensation amounting to some $16,000, with cumulating interest commencing as of August 11, 1971. Claimant's husband, Nathan Kemp, had been fatally wounded on August 10, 1971. At the hearing before the ALJ, The Star stipulated that Kemp, employed by The Star as a delivery truck driver, at the time of the accidental shooting was in a pay status, "on the clock" as it was described.

Whether the fatal shooting "arose out of" Kemp's employment then became and still remains the issue here presented. Unless Kemp's fatal injury so "arose," the claim for compensation must fall.

Appropriately to be regarded is the test presented by Mr. Justice Frankfurter, speaking for the Court in *O'Leary v. Brown-Pacific-Maxon,* 340 U.S. 504, 507, 71 S.Ct. 470, 472, 95 L.Ed. 483, 486 (1951):

All that is required is that the "obligations or conditions" of employment create the "zone of special danger" out of which the injury arose.

*O'Leary* pointed out that it devolved upon the Deputy Commissioner to ascertain whether or not the claim came within the coverage afforded by the Act, the final determination to be deduced from a "combination of happenings and the inferences

drawn from them," *id.,* 340 U.S. at 507, 91 S.Ct. at 472, 95 L.Ed. at 487. When the ultimate conclusion was to be subject to review,

The standard . . . is that discussed in *Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474 [71 S.Ct. 456, 95 L.Ed. 456]. It is sufficiently described by saying that the findings are to be accepted *unless they are unsupported by substantial evidence on the record considered as a whole.* (Emphasis added.)

Mr. Justice Harlan later noted that both *O'Leary* and *Universal Camera* had been written by Mr. Justice Frankfurter and released the same day, and so had provided for us

the leading judicial guide for administrative review, and the most prominent directive to lower courts not to underestimate their responsibilities in this regard. *O'Keeffe v. Smith Associates,* 380 U.S. 359 at 367, 85 S.Ct. 1012, 1017, 13 L.Ed.2d 895, 901 (1965).

Judicial responsibility in this area, he explained, was to include an examination of the whole record and not just those parts of the record which tended to support the position taken by an agency.

That view was specifically recognized by our colleague, Judge Fahy, writing in *Friend v. Britton,* 95 U.S.App.D.C. 139, 141, 220 F.2d 820, 822 (1955). We are not to sustain merely because administrative findings are substantiated by some isolated evidence, even as we recognize fully the humanitarian aspects of the Act. Since review involves resort to the record, considered as a whole, a different result may emerge if it thus appears that the administrative findings *are* supported by substantial evidence. *See, e. g., Wheatley v. Adler,* 132 U.S.App.D.C. 177, 184, n. 15, 407 F.2d 307, 314, n. 15 (1968). Further instructed by Mr. Justice Frankfurter, we read

Congress has merely made it clear that a reviewing court is not barred from set-

---

4. We have not considered here the employer's claim that the decedent illegally possessed the handgun. No evidence was presented to support this contention. In the absence of evidence, it is presumed that possession was legal.

ting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Universal Camera Corp. v. Labor Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456, 468 (1951).

Accordingly, consider *Foster v. Massey,* 132 U.S.App.D.C. 213, 215, 407 F.2d 343, 345 (1968), where with Foster driving his own car to work, the injury did not "arise out of" employment, and *Cardillo v. Liberty Mutual Co.,* 330 U.S. 469, 479, 67 S.Ct. 801, 807, 91 L.Ed. 1028, 1037 (1947); in short, if the injury does not arise out of a claimant's employment, the Act does not apply. *Cf. Wolff v. Britton,* 117 U.S.App.D.C. 209, 213, 328 F.2d 181, 185 (1964).

## I

In line with the principles above delineated, review should be had pursuant to the provisions of 33 U.S.C. § 921(b)(3) and (c). Not only are we "not to underestimate" our responsibilities, we are no longer barred from setting aside the award of the ALJ where we can not "conscientiously" find that the evidence supporting the award is substantial after taking account of the entire body of *evidence,* pro and con. *Universal Camera Corp. v. Labor Bd., supra,* 340 U.S. at 488, 71 S.Ct. at 464, 95 L.Ed. at 467.

It is clear enough that a mere presumption does not carry the day. A presumption does not acquire the attribute of evidence, indeed "[i]ts only office is to control the result where there is an entire lack of competent evidence." *DelVecchio v. Bowers,* 296 U.S. 280, 286, 56 S.Ct. 190, 193, 80 L.Ed. 229, 233 (1935).

Here, the ALJ decided that the claimant was entitled to prevail. Her late husband when fatally wounded was in a zone of special danger arising out of the conditions and circumstances of his employment, the ALJ concluded. The Benefits Review Board declined to reach any such question. Rather, the Board summarily affirmed the award on the stated ground that there was "substantial evidence" to support a finding that "the injury causing death arose out of and in the course of decedent's employment."

## A

Nathan Kemp on August 10, 1971, was employed by The Star as a truck driver whose duty it was to deliver newspapers on routes prescribed by his employer.

At times and for purposes personal to himself, he drove a taxicab which, on the fateful day, he had parked on some private property across the street from The Star's loading platform.

Kemp, at least on occasion, kept a loaded revolver in the locked trunk of that taxicab, indeed there it was on August 10, 1971, while Kemp was delivering newspapers in The Star's truck.

After his morning run, Kemp about 3:30 p. m. returned the truck to the area of The Star's loading platform, and then was informed by Walter Ward that during Kemp's morning absence, the right rear fender of his taxicab had been struck and dented.

Kemp was not to start out on his afternoon delivery until 4:25 p. m. and until then he was free to do whatever he chose.

Kemp and Ward were acquainted with Harry Andrews who, in his off hours, engaged in automobile body work.

The three men walked over to examine the extent of damage to Kemp's taxicab.

When the trunk of the cab was opened so that Andrews could appraise his problem, Ward saw the pistol in the trunk, removed it and commenced handling it, as the ALJ specifically found.

Andrews suggested that he could pound out the dent in the fender with a rubber mallet, and the three men drove some five city blocks to The Star's maintenance garage.

There, a mechanic named Michael owned a rubber mallet which he loaned to Andrews.

Once again the trunk of the taxicab was opened, and the ALJ found that "Ward accidentally fired the gun and killed the decedent," with the Benefits Review Board noting in its opinion that while one employee, Andrews, "was attempting to repair the automobile, the other [Ward] removed a pistol owned by the decedent from the automobile trunk."

Kemp was fatally wounded at 4:05 p. m., when Ward accidentally fired the pistol.

There is no suggestion, however remote, that The Star or any of its supervisory employees had any knowledge that Kemp owned a taxicab or that he owned or carried a loaded revolver in the trunk of that cab.

The foregoing recital, abstracted from what the ALJ described as "credible evidence," demonstrates clearly enough the series of events as they occurred on August 10, 1971, out of which the decedent, Nathan Kemp, encountered the injury culminating in his death. Courts have realized fully that compensation is not confined by common-law concepts of the scope of employment; that the test of recovery is not a causal relation between the nature of employment of the injured person and the accident; but it would seem beyond peradventure that Kemp was not engaged at the time of the injury in an activity of benefit to The Star—nor was it necessary that Kemp be so engaged. As matters stood, up to the moment of injury, there was thus not a scintilla of evidence that the death "arose out of" the employment.

### B

Assuredly, the ALJ must have been of like mind respecting the factual situation as so marshalled. His opinion pointed to *Hartford Accident & Indemnity Co. v. Cardillo,* 72 App.D.C. 52, 112 F.2d 11, (DCCA), *cert. denied,* 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415 (1940), as a possible source of principles to control the instant case. There, two co-workers on the job at the time of injury became so embroiled that one Downey with his fist struck the claimant Bridges a bone-shattering blow. *Cardillo,* 72 App.D.C. at

54, 112 F.2d at 13, recited that if work *exposes employees* to a risk to which the general public is not exposed and *injury results therefrom,* it "arose out of" employment; again *id.* at 55, 112 F.2d at 14, continued, no more is necessary than that the *work subject the employee to a peril* which comes from the fact that he is *required* to be *in the place where it strikes*—whether on the employer's premises or on a street or what not; indeed, *id.* at 57, 112 F.2d at 16, *Cardillo* concluded it is sufficient that the *work brings the claimant within the range of peril* by *requiring his presence* there *when it strikes.* Bridges was not an "aggressor" either in banter or in a physical encounter, it was noted. So we find the ALJ in the instant case emphasizing that there was no evidence that Kemp, the decedent, was the *aggressor* in *handling the gun!*

Since such emphasized criteria were in no way applicable here, it would seem the ALJ felt bound to develop on the entire record, that there was a zone of danger arising from the conditions and circumstances of the employment. So he found that The Star had provided no areas of relaxation for its truck drivers during the periods between delivery runs. Moreover such employees were not prohibited from going to The Star garage to dump trash, to pick up batteries, to exchange accessory items or to procure gasoline for their trucks. The Star's employees might obtain help and advice from the mechanics at the garage. Kemp, with Ward and Andrews, was not prohibited from borrowing Michael's rubber mallet. After they had approached the garage but before the repair job on Kemp's taxicab was commenced, it seemed important to the ALJ, the cab was parked on a black-top area between the building line and the curb line of the street. Are such "facts" relevant?

It may be assumed that the ALJ was groping for some evidence, however remote, to place Kemp and his coemployees in some sort of association with The Star at the time of the injury. We may only speculate as to what he would have concluded if

instead of approaching The Star garage, they had stopped at a service station up the street.

This claimant was not killed when out delivering papers in The Star's delivery truck. The ALJ's opinion thus, apparently, was intended to depict conditions and to describe circumstances out of which he could infer that a zone of danger arose. But the *zone of danger* was Kemp's own loaded pistol *locked in the trunk of Kemp's own taxicab.*

The evidence disclosed that some 30 to 34 truck drivers were employed by The Star. The various drivers called as witnesses knew of no driver who carried a gun on a delivery truck. At least one driver had been subjected to slurring remarks with racial overtones. Responding to counsel, one driver testified that he was afraid "on one occasion" when, over in Virginia "this cop pulled up beside me" and "he just stuck a shotgun out the window at the truck." The witness continued that the officer did not stop and that he just "drove by with a shotgun out the window." The widow testified that only once had she ridden on The Star's truck with her husband. He drove to Gettysburg and on that occasion had his pistol with him. The transcript discloses:

Q. Well, were there discussions about why he got the gun?

A. No.

Q. Why he had it?

A. We really didn't discuss the gun. He had the gun because he was fearful of being robbed.

He collected no money on that trip, "regularly he didn't collect money," but, the questioning continued,

Q. And did he work the taxicab sometimes?

A. Yes.

Q. And in working the taxicab he collected money from his fares, did he not?

A. True.

Upon such evidence, mere conclusions, inference upon inference, largely hearsay in nature or even highly speculative as ex-

pressed, the ALJ seems to have decided that the decedent Kemp, alone of all the drivers, had carried the loaded pistol

for his personal protection and for the protection of the Employer's property during the course of his employment. Some of the other company drivers owned guns and kept them in their cars, but not in their trucks.

So reads the opinion of the ALJ.

No slightest doubt need be entertained that the ALJ might properly infer that the decedent when moonlighting with his taxicab illegally carried a loaded pistol for his own "protection," whether or not to shoot molesters, he does not say.

In Part A *supra,* mention is made of certain "credible evidence." Part B has undertaken only to suggest as "incredible" a decision that Kemp's injury and death "arose out of" his employment. Rather, it would appear that the conclusion reached by the ALJ was "arbitrary and capricious" and erroneous as a matter of law.

## II

The standard of review to control in actions arising under the National Labor Relations Act for years had been the source of controversy. The perceptive Mr. Justice Frankfurter grasped the nettle when in *Universal Camera Corp. v. Labor Bd.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Court undertook clarification of the problem.

We may pause briefly to note certain steps in the evolution of the rule ultimately to be announced in *O'Leary v. Brown-Pacific-Maxon,* 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951). In *O'Leary,* the Court considered the scope of judicial review of findings of fact governed by the Administrative Procedure Act. There, *id.* at 508, 71 S.Ct. at 472, 95 L.Ed. at 487, the Court found the respective provisions applicable in Labor Board situations to be related and sufficiently to be

described by saying that the findings are to be accepted unless they are unsupported by substantial evidence on the record considered as a whole.

That is the standard here to be applied. *O'Keeffe v. Smith Associates,* 380 U.S. 359, 362, 85 S.Ct. 1012, 1014, 13 L.Ed.2d 895, 897 (1965).

Turning back to *Universal Camera, supra,* 340 U.S. at 487, 71 S.Ct. at 464, 95 L.Ed. at 467. Mr. Justice Frankfurter wrote that

the standard of proof specifically required of the Labor Board by the Taft-Hartley Act is the same as that to be exacted by courts reviewing every administrative action subject to the Administrative Procedure Act.

He also noted, 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 468, that Congress had made it clear

that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. *Id.,* 340 U.S. 488, 71 S.Ct. at 464, 95 L.Ed. at 467.

Various Courts of Appeals including the Second Circuit had not so appreciated their reviewing power. 340 U.S. at 476, n. 1, 71 S.Ct. at 458, 95 L.Ed. at 461. Chief Judge Hand, apparently believing that "no material change" had been made nevertheless deemed the subject "already too perplexing." *National Labor Rel. Bd. v. Universal Camera Corp.,* 179 F.2d 749, 753 (CA 2 1950). Circuit Judge Swan, however, would have denied enforcement of the Board's or-

der; indeed when dissenting, *id.* at 755, he stated the view:

if an administrative agency ignores all the evidence given by one side in a controversy and with studied design gives credence to the testimony of the other side, the findings would be arbitrary and not in accord with the legal requirement.

When the Second Circuit's judgment had been vacated and the cause, after remand, was again considered, we find Judges L. Hand and Swan reversing[1] and dismissing the petition.

Faced with such an impasse in the Second Circuit, Mr. Justice Frankfurter deemed it essential that he trace the evolution of the review provisions of the Taft-Hartley Act as compared to those in the recently adopted Administrative Procedure Act. So it was, in writing for the Court, unanimous in Parts I and II of *Universal Camera Corp. v. Labor Bd., supra,* 340 U.S. 477–492, 71 S.Ct. 459–466, 95 L.Ed. 461–469, he began with the criticisms which had been brought to the attention of Congress. No longer was it to be sufficient merely to find some evidence which when viewed in isolation substantiated the Board's findings. *See* 340 U.S. at 478, 71 S.Ct. at 459, 95 L.Ed. at 462, *and compare* Judge Swan's comment, *supra.* Mr. Justice Frankfurter took note that there had been interpretations by critics who denounced irresponsible admission and weighing of hearsay, mere opinion, and emotional speculation in place of factual evidence. Earlier Wagner Act decisions had created such a measure of dissatisfaction,[2] as many judges will recall, that there

[1]. The respected Judge Frank, at 190 F.2d 429, 432 (1951), concurred, with an explanation of how his interpretation of secondary inferences had made possible his change of position. He elaborated by reference to his discussion in his Appendix, *Wabash Corp. v. Ross Electric Corp.,* 187 F.2d 577, 601–603 (CA 2 1951).

[2]. Because of his intense interest in this area where there had been created "new instruments of public power," Mr. Justice Frankfurter was clearly committed to the achievement of success. He most certainly was aware that the President had vetoed the Walter-Logan Bill for reasons explained in his message to the Congress and as noted by Attorney General Jackson in his analysis of the Problem. *See Univer-*

*sal Camera Corp. v. Labor Bd., supra,* 340 U.S. at 479, note 9, 71 S.Ct. at 460, 95 L.Ed. at 462, where we find reference to the veto message, 86 Cong.Rec. 13942–13943, *et seq.* The attacks upon the Wagner Act and its administration reflected, both within and without the Congress, a degree of antipathy which was becoming a substantial threat to the success of the administrative process. Consider, too, views which had been expressed by the Court itself, *e. g. Norton v. Warner Company,* 321 U.S. 565, 569, 64 S.Ct. 74, 78, 88 L.Ed. 931, 934 (1944). Justices Douglas and Black declined to concur in Part III of the opinion in *Universal Camera Corp. v. Labor Bd.*

From time to time, resolution of conflicting positions within the Court became arduous in-

emerged such terms as "administrative absolutism." Congress had been made aware of the "shocking injustices" which had "stimulated pressures for legislative relief from alleged administrative excesses." *Id.,* 340 U.S. 478, 479, 71 S.Ct., 460, 95 L.Ed. 463. Justifiable or not, such criticism had to be faced.

Each successive step developed in *Universal Camera Corp.,* 340 U.S. at 490, 71 S.Ct. at 466, 95 L.Ed. at 486, culminated in the conclusion that reviewing courts "must be influenced by a feeling that they are not to abdicate the conventional judicial function." The responsibility devolving upon us

> is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeal.

The newly discerned standards were applied in *Labor Board v. Pittsburgh S.S. Co.,* 340 U.S. 498, 502, 71 S.Ct. 453, 456, 95 L.Ed. 479, 483 (1951) where the inferences [3] on which the Board's findings were based were seen to be overborne by evidence calling for contrary inferences developed from consideration of the whole record.

Finally, as we know, *O'Leary* has provided for us the ultimate conclusion by which we here must judge the record before us. *O'Leary, supra,* 340 U.S. at 508, 71 S.Ct. at 472, 95 L.Ed. at 487. Moreover, our review

> is not to be a mere rubber-stamping of the Deputy Commissioner's order when the reviewing court is unable to conscientiously conclude that the evidence supporting such decision is substantial. (Citation omitted.)

*Goins v. Noble Drilling Corporation,* 397 F.2d 392, 394 (CA 5 1968); *Friend v. Britton,* 95 U.S.App.D.C. 139, 141, 220 F.2d 820, 822 (1955).

The Act does not, and never was intended to, provide automatic insurance for every industrial accident. It was intended to pass along to industry the cost of alleviating injurious results which arise out of the employment of an injured claimant. Broadly and liberally interpreting the purpose and the plan of the Act, as we are bound to do when the facts will so permit, equally we are duty bound to deny relief unless the injury "arose out of" the employment. Whatever might have been the case if while out delivering newspapers Kemp had suffered an injury even by the accidental discharge of his own pistol, such is not this situation. Here, obviously, however "fearful" Kemp might have been, he did not even take the gun on his delivery run on the morning of August 10, 1971.

As the ALJ had interpreted the record, the claimant would have been entitled to recover if his gun had been discharged by a fall down the front steps of his house. Such a misfortune, surely, can not properly be said to arise out of his employment.

Thus analyzed, if we cannot conscientiously find that the evidence supporting an award is substantial when viewed in the light that the record in its entirety furnishes, a reviewing court should set aside the award.

And that is this case.

deed, so that all the more remarkable was the measure of accord, achieved by Mr. Justice Frankfurter in *Universal Camera, supra. See* generally, From The Diaries of Felix Frankfurter (1975) by Joseph P. Lash with his biographical note.

**3.** *See* footnote 1.