75 N.J. Super. 76 (1962)
182 A.2d 168
ELIZABETH JONES, PETITIONER-RESPONDENT,
v.
CONTINENTAL ELECTRIC CO. INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 15, 1962.
Decided June 13, 1962.
*77 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Isidor Kalisch argued the cause for appellant.
Mr. John S. Giava argued the cause for respondent.
The opinion of the court was delivered by GAULKIN, J.A.D.
The Division and the County Court awarded petitioner workmen's compensation for the death of her husband, Thomas Jones, and the employer, Continental Electric Co., Inc. (Continental) appeals.
Jones had been employed as a watchman by Continental for 12 years. At the time he was killed, his shift was from 7 P.M. to 7 A.M. The evidence does not reveal precisely what his duties were. The only thing that does appear is that he was required to make rounds of the plant, punching American District Telegraph (A.D.T.) clocks at stated intervals. We do not know how many clocks there were, or the length of the intervals. The plant consisted of three buildings, the main one fronting on the south side of Ferry Street. The two smaller buildings were on the opposite side of the street. Jones was therefore required to cross Ferry Street in making his rounds. There is no evidence that the employer gave any instructions as to the point on Ferry Street at which Jones was to cross. The main building was between Main Street and Magazine Street, but both these streets made T intersections with the southerly line of Ferry Street. There were no traffic lights or marked crosswalks at these intersections. The nearest complete intersection was at Fillmore and Ferry Streets, approximately 575 feet west of the plant buildings. This intersection did have a marked crosswalk and was controlled by traffic lights.
*78 There was no cafeteria or other eating facilities on the premises during the night, except coffee and soft drink machines. There is no evidence that the employer had any rules or gave any instructions as to Jones' time, place or opportunity to eat. Obviously Jones would be expected to eat during the 12 hours of his shift. As the court said in Bollard v. Engel, 4 N.Y.S.2d 363, 365 (App. Div. 1938), affirmed 17 N.E.2d (Ct. App. 1938), and cited with approval by Judge (now Justice) Jacobs in Bradley v. Danzis Pharmacy, 5 N.J. Super. 330 (App. Div. 1949), "In order that a workman may continue to render service it is essential that he should eat."
Mrs. Jones testified that Jones usually took food with him from home, or she or their son brought it to him. However, on the night in question he had left his home without taking food and without arranging to have it brought to him. He told Mrs. Jones he "would get something later," which would indicate that on occasion, during the 12 years he worked for Continental, he had purchased food during his hours of duty. There is nothing in the evidence that indicates that he was forbidden to leave the premises or deviate from his rounds for that purpose. Where the death of an employee occurs before he has an opportunity to tell why he was where he was, and doing what he was doing when he was injured, the courts are satisfied with "very scanty circumstantial evidence that the accident arose out of, and in the course of, the employment." Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304 (App. Div. 1953); Olivera v. Hatco Chemical Co., 55 N.J. Super. 336 (App. Div. 1959), certification denied 30 N.J. 557 (1959).
About midnight he told Frank J. Zvolensky, a power press operator in the main building, and the only other employee in the plant, that he was going out for a sandwich and for Zvolensky to answer the telephone while he was gone. It is admitted that this was the customary arrangement when Jones was out of the main building. Jones *79 did not say how long he would be gone, but he knew Zvolensky's shift ended at 12:30. There was no testimony as to when Jones was due to punch the next clock, or in which building. However he took with him the keys which he would have to have to enter any of the three buildings.
About five minutes after he left the main building Jones was killed on Ferry Street by an automobile. His body was found on or near the crosswalk running from the southeasterly to the northeasterly corners of Ferry and Fillmore Streets. On the northeast corner there was a diner. There was no proof that there was any place closer to the plant open at that hour where food could be bought. Indeed, there was no proof that even the diner was open and, of course, none that Jones had been there. If Jones did intend to enter the diner, there is no proof whether he intended to eat at the diner or to buy a sandwich to take out.
The employer contends that death did not occur in the course of decedent's employment and did not arise out of the employment. It admits that "[e]mployees who, within the time and place of their employment, engage in acts which minister to personal needs do not thereby leave the course of their employment unless the extent of the departure is so great that an intent to abandon the job temporarily may be inferred," quoting from Crotty v. Driver Harris Co., 49 N.J. Super. 60 (App. Div. 1958) (emphasis the employer's). It argues, however, that when Jones went to the intersection 575 feet from the nearest plant door, and there crossed Ferry Street to get something to eat, the extent of the departure was so great that the intent to abandon the job temporarily must be inferred, just as when an employee goes home for lunch. But what would the employer have had Jones do? As we have said, there is no proof that the employer required Jones to bring his lunch, and the employer gave him no time off to leave the plant to eat. Was Jones then not to eat? In the absence of proof of specific instruction to that effect, that would be an unreasonable assumption. Green v. DeFuria, 19 N.J. *80 290 (1955); Bollard v. Engel, supra. Therefore, we must assume that the employer contemplated, at least, that at times the employee would go out to buy something to be brought back and eaten in the plant. Since there does not appear to have been any place closer to the plant to make such a purchase, going 575 feet to the corner could not have been an unexpected deviation. Cf. Neumeister v. Eastern Brewing Corp., 73 N.J. Super. 193 (App. Div. 1962), certification denied 37 N.J. 88 (1962). Nor was it a material deviation. He left Zvolensky on the premises, and, for aught that appears, he intended to be back in a very few minutes. Cf. Green v. DeFuria, supra. On Ferry Street Jones was within sight and sound of the plant, and probably in as good a position to watch the two smaller buildings as if he had been in the main building. And, as we have said, there is no indication that the trip to the diner would have made him late for the next clock punch.
There is nothing to indicate what, if anything, Jones was required to do between the times that he punched clocks. Presumably, he would "watch" (whatever that entailed) the interiors of the buildings while going from clock to clock, and the exteriors and the surrounding areas while passing from building to building. There is nothing to indicate that the deviation (if it was one) interfered in any way with his duties, or detracted from their efficient performance.
Being a watchman, and having no fixed hour or place to eat, Jones had the right to eat anywhere on the premises which he was not forbidden to enter. Cf. Robertson v. Express Container Corp., 13 N.J. 342 (1953); Green v. DeFuria, supra. He could have eaten, if he chose, while walking from building to building, even while crossing Ferry Street, and if he had been injured while doing so it would have been compensable. Since his job was to watch outdoors as well as indoors he could have eaten out of doors, if he so desired  provided, of course, he punched the A.D.T. clocks on time and did not go so far away *81 from the buildings as to be materially unable for a substantial time to perform his duties as watchman. Subject to the same restrictions, he could take any route he chose in going from building to building. He could have chosen (absent contrary instructions) to cross Ferry Street only at Fillmore Street. As has been shown, Fillmore was the only intersection where there was a crosswalk or a traffic light. Crossing in a direct line from the main building to the subsidiary buildings would have meant crossing in the middle of the block, or "jay-walking."
Jones was killed on a hot July night. If he had decided to get a breath of cool midnight air by making his rounds via the fatal crossing, or gone to sit on a bench or on someone's porch near the intersection to cool off, or to have his sandwich, would he have forfeited his right to compensation the moment he crossed an imaginary line to be arbitrarily called, because of distance, the boundary between a minor and a major deviation, regardless how immaterial in fact the deviation was? We think not.
At least part of Ferry Street was part of the employer's premises, within the meaning of Lewis v. Walter Scott & Co. Inc., 50 N.J. Super. 283 (App. Div. 1958). If the point at which Jones was killed was not, Jones had, at most, stepped away to less than a material degree from the direct line of his route of duty and with no intention to abandon the job, even temporarily. Larson says (1 Workmen's Compensation Law, § 19.63, p. 292):
"* * * the courts now generally recognize that human beings do not run on tracks like trolley cars, and therefore uphold awards in situations like the following: running across the street in the course of a delivery trip to buy a little food; getting cigarettes during a trip to or from work in the employer's conveyance; stopping at one's home to get a raincoat and leave some meat; crossing the road during a delivery trip to have a glass of beer at two o'clock in the afternoon; picking up two young ladies and taking them home while driving a car to test its brakes; and buying a toy during spare time to take home to a child. These `insubstantial' deviations, then, are largely the kind of momentary diversions which, if undertaken *82 by an inside employee working under fixed time and place limitations, would be compensable under the personal comfort doctrine. For, while crossing a street may be a more conspicuous deviation than crossing a room, there is really no difference in principle between the trucker, whose work-place is the street, when he crosses the street for a glass of beer, and an inside worker when he goes an equal distance down the hall to get a cola drink from the cola machine."
In Redfield v. Boulevard Gardens Housing Corp., 167 N.Y.S.2d 59 (App. Div. 1957), motion for leave to appeal denied 146 N.E.2d 412 (Ct. App. 1957), Redfield was a patrolman on a housing project. His hours of work were from 3 P.M. to 11 P.M. About 6 P.M. he crossed the public street adjacent to the premises of his employer to get a newspaper and while returning he was struck by an automobile. The employer contended that Redfield went for the newspaper on his own time, since this was his dinner hour, and therefore he had separated himself from his employment at the time of the accident. The court affirmed an award of compensation, saying (at p. 61):
"The departure of an employee for a matter of minutes from the premises where he works to satisfy a personal desire, such as to get a cup of coffee or a newspaper, especially when it becomes a custom within the knowledge of the employer, should not be held under working conditions as they exist today to constitute a separation from employment. The Workmen's Compensation Law should be liberally construed and the protection extended to an employee should not be voided for light and trivial causes. Its application within reasonable limits should be construed in consonance with realistic working habits and conditions that are commonly known to exist."
As the court said in Western Pipe & Steel Co. v. Industrial Accident Commission, 121 P.2d 35, 37 (Cal. D. Ct. App. 1942), "Acts of the employee for his personal comfort and convenience while at work, such as taking a drink of water, lighting a cigarette, warming himself, etc., do not interrupt the continuity of the employment. This exception is not limited to acts performed on the employer's premises." See also Bollard v. Engel, supra; Karl v. Fair Shoe Repair, Inc., *83 55 N.Y.S.2d 1 (App. Div. 1945); Rucker v. Nassau-Beekman Realty Corporation, 73 N.Y.S.2d 275 (App. Div. 1947); Sullivan's Estate v. Motor Realty Corporation, 73 N.Y.S.2d 276 (App. Div. 1947); Caporale v. Department of Taxation & Finance, 153 N.Y.S.2d 738 (App. Div. 1956), affirmed 142 N.E.2d 213 (App. Ct. 1957); Bodensky v. Royaltone, Inc., 168 N.Y.S.2d 908 (App. Div. 1957); Kapuscinski v. John P. Picone, Inc., 194 N.Y.S.2d 571 (App. Div. 1959).
It is true that in most of the cited cases the employer knew of the employee's practice to leave the premises. However, we perceive no difference here. As we have said, the evidence indicates that it was not unusual for Jones to obtain his meal from sources other than his home. The employer here knew that Jones had the right to be on the street, even if only to pass from building to building. The employer knew or should have known that the employee might stop to buy cigarettes or something to eat and, knowing that he must eat during the night, that he might go to the nearest place open provided it did not take him out of the sphere of his duties. And therein lies the difference between this case and the mealtime going and coming cases. When the employee is given time off to leave the premises to have his meal, logic supports the holding that an injury during that interval does not arise out of and in the course of the employment. But see O'Brien v. First Camden Nat. Bank & Trust Co., 37 N.J. 158 (1962).
The judgment is affirmed.