**Michael L. DURRAH, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Director, Office of Workers' Compensation Programs, U.S. Department of Labor, Respondents.**

**No. 84–1218.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 13, 1985.

Decided April 30, 1985.

---

Petition for Review of an Order of the Benefits Review Board.

Timothy F.X. Cleary, Washington, D.C., for petitioner.

John F. Ward, for respondents. Marianne Demetral Smith and Donald S. Shire, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondents.

Before GINSBURG and BORK, Circuit Judges, and OBERDORFER,* District Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Michael L. Durrah commenced employment with the Washington Metropolitan Area Transit Authority (WMATA) as a special police officer on July 30, 1979. The accident at issue occurred some three weeks later, on August 22, 1979. Durrah, at the time of the accident, was on duty on the midnight to 8:00 a.m. shift at a large Metrobus depot. That night, for the second time since he began working for WMATA, Durrah was assigned to Post No. 1, where he was responsible for monitoring all traffic entering or leaving the depot. At approximately 4:00 a.m., Durrah left the guardhouse and purchased a soda from a vending machine WMATA had installed in the employees' lounge on the premises. In alleged contravention of WMATA's instructions, Durrah did not report that he was leaving the guardhouse and obtain a substitute to cover Post No. 1 in his absence. Upon leaving the lounge to return to Post No. 1, Durrah slipped on a staircase. He immediately complained of a knee injury and in due course sought benefits under the Longshoremen's and Harbor Workers' Compensation Act. 33 U.S.C. §§ 901–950

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

(1982 & Supp. I 1983).[1] An administrative law judge (ALJ) denied Durrah's claim, *Durrah v. WMATA*, No. 80–DCWC–224 (Sept. 29, 1981) (hereafter "ALJ Decision"), and the Benefits Review Board (BRB) affirmed. *Durrah v. WMATA*, 16 BEN.REV. BD.SERV. (MB) 333 (BRB May 8, 1984). On Durrah's petition for review, we reverse the BRB's decision and remand the case for further proceedings consistent with this opinion.

Durrah alleges an injury occurring on his employer's premises in the course of his workday. There is no dispute that this injury would be one "arising out of and in the course of employment,"[2] 33 U.S.C. § 902(2), if Durrah had obtained both permission and a substitute to cover Post No. 1 before going to the employees' lounge. We hold that his fall was securely within the time and space boundaries of his employment.

The lounge and staircase were facilities WMATA expected its employees to use.[3] Moreover, Durrah's conduct—getting a soft drink—is generally incidental to day- (or night-) long employment. The soda machine Durrah visited was maintained by the employer on the employer's premises. Employee use of the machine was an anticipated occurrence in the course of a workday. "Generally, personal comfort activities such as obtaining a cold drink for a meal come within the course of employment." ALJ Decision at 5. *See, e.g., Prater v.*

*Indiana Briquetting Corp.*, 253 Ind. 83, 251 N.E.2d 810, 813 (1969); *Jones v. Continental Electric Co.*, 75 N.J.Super. 76, 182 A.2d 168 (1962); *see also Wheatley v. Adler*, 407 F.2d 307 (D.C.Cir.1968) (en banc). It is not "necessary that the employee be engaged at the time of the injury in activity of benefit to his employer. All that is required is that the 'obligations or conditions' of employment create the 'zone of special danger' out of which the injury arose." *O'Leary v. Brown-Pacific-Maxon*, 340 U.S. 504, 507, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951). *Accord, e.g., O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc.*, 380 U.S. 359, 362, 85 S.Ct. 1012, 1014, 13 L.Ed.2d 895 (1965) (per curiam); *Hensley v. WMATA*, 655 F.2d 264 (D.C.Cir.1981), *cert. denied*, 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982); *Director, OWCP v. Brandt Airflex Corp.*, 645 F.2d 1053, 1056 (D.C.Cir.1981); *Evening Star Newspaper Co. v. Kemp*, 533 F.2d 1224 (D.C.Cir.1976). In short, had Durrah first secured a replacement, his injury would unquestionably have "take[n] place within the period of the employment, at a place where the employee reasonably may be, and while he [was] engaged in doing something incidental [to the employment]." 1 A. LARSON, *supra* note 3, § 14.00.

The ALJ found, however, that Durrah violated a WMATA rule in taking a soda break: he left his duty station to go to and

---

1. Injuries to District of Columbia employees prior to the July 24, 1982, effective date of the District of Columbia Workers' Compensation Act, D.C.CODE ANN. §§ 36–301 to –345 (1981 & Supp.1984), are covered by the Longshoremen's and Harbor Workers' Compensation Act. D.C. CODE ANN. §§ 36–501 to –504 (1973 & Supp. 1974). *See Crum v. General Adjustment Bureau*, 738 F.2d 474, 475 n. 2 (D.C.Cir.1984).

2. "Arising 'out of' *and* 'in the course of' employment are separate elements: the former refers to injury causation; the latter refers to the time, place, and circumstances of the injury." *U.S. Indus./Fed. Sheet Metal, Inc. v. Director, OWCP*, 455 U.S. 608, 615, 102 S.Ct. 1312, 1317, 71 L.Ed.2d 495 (1982). Only "the time, place, and circumstances of the injury" are at issue in this case. *See Durrah v. WMATA*, 16 BEN.REV.BD. SERV. (MB) at 333.

3. We have no occasion to consider how far employment circumstances may range beyond locations employees are expected to frequent in a routine workday. Our decision does not implicate, and therefore in no way impugns, the numerous cases holding compensable injuries that occur off premises or at locations placed off limits by an employer's rules. *See, e.g., O'Leary v. Brown-Pacific-Maxon*, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951); *Green v. DeFuria*, 19 N.J. 290, 116 A.2d 19 (1955); *Feldman v. A.B.C. Vending Corp.*, 12 N.Y.2d 223, 188 N.E.2d 905, 238 N.Y.S.2d 667 (1963); *Clynes v. Dobler Brewing Co.*, 285 A.D. 72, 136 N.Y.S.2d 525 (1954), *aff'd*, 308 N.Y. 1022, 127 N.E.2d 863 (1955); *Hensley v. Caswell Action Comm.*, 296 N.C. 527, 251 S.E.2d 399 (1979). *See generally* 1A A. LARSON, WORKMEN'S COMPENSATION LAW § 31.-23 (1985) ("Prohibited place").

from the lounge area without requesting permission and without obtaining a substitute to cover Post No. 1. That finding alone determined the case for the ALJ and the BRB. The ALJ ruled, and the BRB agreed, that "[Durrah's] actions were removed from the course of employment when [he] knowingly violated the employer's rule that officers stationed at Post No. 1 never leave the post without express permission." *Durrah*, 16 BEN.REV.BD.SERV. at 334. We explain below why we are unable to accept this peremptory adjudication of Durrah's workers' compensation claim.

Initially, we note the absence of documentary or clear testimonial evidence for the critical finding that Durrah had been forbidden to leave the guardhouse. The statutory presumption of coverage is relevant in this regard. A claim "shall be presumed" to "come[] within the provisions of" the Act "in the absence of substantial evidence to the contrary." 33 U.S.C. § 920(a). The evidence shows that the bus depot had two guardposts; WMATA personnel testified that the Post No. 1 guard was to remain at the guardhouse while the Post No. 2 guard made rounds, which evidently included the employees' lounge. Transcript at 58–61; 75–76. There is no uncloudy record evidence, however, that Durrah, who had begun working at his new station only the night before, was made aware of this distinction between Post No. 1 and Post No. 2 duties.

The ALJ based his declaration "that [Durrah] had notice of the prohibition against leaving the guardhouse" principally upon the assertion that "[the] rule was posted inside the guardhouse, was contained in [Durrah's] guard manual and rule book, and was covered by the two week training session in which [Durrah] participated." ALJ Decision at 4; *see also Dur-*

*rah*, 16 BEN.REV.BD.SERV. at 334. But the best evidence of the tenor of WMATA's rule was conspicuously missing from the record WMATA made. WMATA never placed in evidence the rule book, guard manual, or guardhouse sign upon which the ALJ and, in turn, the BRB relied. We believe these glaring gaps in WMATA's presentation should have attracted the attention of those assigned to judge Durrah's case. Nor is there any indication, through testimony or otherwise, that the posting, manual, or rule book, unseen by the ALJ and BRB, differentiated between Post No. 1 and Post No. 2 duties.

The only other evidence suggesting that Durrah had been informed of a rule confining Post No. 1 guards to the guardhouse [4] was testimony that, on a training ride to facilities in Virginia, Maryland, and the District of Columbia a week prior to starting in his new position, Durrah would have discussed and would have had an opportunity to ask questions about his duties. Transcript at 77. More than references to a written rule never placed in evidence and vague testimony that Durrah had an opportunity to get information bearing on guard responsibilities should be required to overcome the advantage Congress accorded workers by the coverage presumption set out in 33 U.S.C. § 920(a). *See Champion v. S & M Traylor Brothers*, 690 F.2d 285 (D.C.Cir.1982); *Hensley v. WMATA*, 655 F.2d at 267–71; *Swinton v. Kelly*, 554 F.2d 1075, 1084–85 (D.C.Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976). What more the ALJ and BRB perceived we cannot discover in the record.[5]

Our disagreement with the ALJ and BRB, however, goes beyond the cloudy quality of the evidence WMATA presented at the hearing. Even viewing the facts in

---

**4.** The ALJ relied in part on a statement Durrah gave to WMATA, but refused to sign, the morning after the incident. Employer's Exhibit 8. *See* ALJ Decision at 4. In the statement, Durrah indicated as a matter of "common knowledge" that getting a soda without first calling for a replacement was done by "all the rest of the officers," Employer's Exhibit 8, p. 2 at A. 5; he

did not differentiate between Post No. 1 and Post No. 2.

**5.** Any doubt the ALJ and BRB might have entertained as to the source and severity of Durrah's knee problem, *see* Transcript at 25–29, should not have influenced the threshold decision whether the incident he alleged fell within the compensation statute's compass.

the light most favorable to WMATA, we do not comprehend how it can be maintained that Durrah's transgression "so thoroughly disconnected [him] from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment." *O'Leary*, 340 U.S. at 507, 71 S.Ct. at 472 (quoting *Waters v. William J. Taylor Co.*, 218 N.Y. 248, 252, 112 N.E. 727, 728 (1916)); *accord, e.g., O'Keeffe*, 380 U.S. at 362, 85 S.Ct. at 1014. The asserted violation did not place Durrah in the path of new risks not inherent in his employment situation. Had Durrah followed his employer's alleged instructions to the letter in obtaining permission to take a mid-shift break at the employees' lounge soda machine, his injury would have occurred in the very same place on WMATA's premises, at the same time, and in the same manner. Far from severing the link between employment circumstances and injury, Durrah's deviation did not determine the time or place of his injury, and did not render his activity nonincidental to employment.

The ALJ and BRB cited no authority closely in point in support of their dispositions.[6] WMATA, in its brief to this court, offers as the most analogous cases ones in which guards left the work premises and thus removed themselves, as Durrah did not, from the space boundaries of routine compensation coverage. *Lisonbee v. Chicago Mill & Lumber Co.*, 278 So.2d 5 (La. 1973); *Metropolitan Sand & Gravel Corp. v. Lowe*, 22 F.Supp. 65 (E.D.N.Y.1938). In sharp contrast, the fateful staircase here came with the territory.[7] It was part of the employment scene for guards who did rounds, for guards assigned to a fixed spot who obtained replacements, and for guards who did not. Fault on Durrah's part there may be, but to deny compensation solely because of misconduct that does nothing to alter the relationship between employment setting and injury would be alien to the workers' compensation scheme.[8] Whatever discipline Durrah's alleged rule violation may have warranted, it distorts workers' compensation precedent, and the basis in law and reason for that precedent, to describe his staircase slip as outside the risk

---

6. The cases discussed in 1A A. LARSON, WORKMEN'S COMPENSATION LAW §§ 31.00, 31.12 (1981), cited by the BRB, are inapposite. No "violation[ ] of express prohibitions relating to incidental activities," *id.* § 31.00, is alleged. No rule forbade getting sodas or going to the lounge. The asserted rule addressed merely the manner of engaging in activity the employer routinely permitted. In the cases Professor Larson discusses, unlike Durrah's, obedience would have prevented the injury. The sometimes *recherché* distinctions invoked to resolve obscure cases should not cloud analysis where the employee is injured in the course of work-incidental conduct on the employer's premises during working hours.

7. We do not venture in this opinion any overarching views on whether or when guards who leave their employer's premises seeking personal comfort, *see Jones v. Continental Elec. Co.*, 75 N.J.Super. 76, 182 A.2d 168 (1962), or for other reasons, *see Green v. DeFuria*, 19 N.J. 290, 116 A.2d 19 (1955); *Feldman v. A.B.C. Vending Corp.*, 12 N.Y.2d 223, 188 N.E.2d 905, 238 N.Y. S.2d 667 (1963), or who otherwise violate rules designed to confine or minimize workplace risks to the employee, *see Merchant v. Pinkerton's, Inc.*, 50 N.Y.2d 492, 407 N.E.2d 443, 429 N.Y.S.2d 598 (1980), should nonetheless fall within the ambit of the Act.

8. In *Morrison-Knudsen Constr. Co. v. Director, OWCP*, 461 U.S. 624, 636, 103 S.Ct. 2045, 2052, 76 L.Ed.2d 194 (1983), the Court articulated the competing concerns leading to the creation of the workers' compensation scheme:

> [The Act] was designed to strike a balance between the concerns of the longshoremen and harbor workers on the one hand, and their employers on the other. Employers relinquished their defenses to tort actions in exchange for limited and predictable liability. Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail.

*See also, e.g., Potomac Elec. Power Co. v. Director, OWCP*, 449 U.S. 268, 281, 101 S.Ct. 509, 516, 66 L.Ed.2d 446 (1980) (the Act "imposes liability without fault and precludes the assertion of various common-law defenses"). The Act "is inconsistent with any notion that recovery is barred by misconduct which amounts to no more than temporary lapse from duty, conduct immediately irrelevant to the job, contributory negligence, fault, [or] illegality." *Evening Star Newspaper Co. v. Kemp*, 533 F.2d 1224, 1228 (D.C.Cir.1976) (quoting *Hartford Accident & Indem. Co. v. Cardillo*, 112 F.2d 11, 17 (D.C. Cir.), *cert. denied*, 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415 (1940)).

zone that the conditions of his employment created. *See Gondeck v. Pan American World Airways, Inc.,* 382 U.S. 25, 27, 86 S.Ct. 153, 154, 15 L.Ed.2d 21 (1965) (per curiam); *O'Keeffe,* 380 U.S. at 362, 85 S.Ct. at 1014; *O'Leary,* 340 U.S. at 507, 71 S.Ct. at 472.

### Conclusion

The ALJ and BRB relied on evidence that was far from the best WMATA could have offered; in view of the statutory presumption of coverage, that evidence should not have been embraced so swiftly. More basically, even assuming the facts to have been as stated by the ALJ, the employee's alleged misconduct did not sever the relationship between the employment circumstances and the injury. We therefore reverse the BRB's decision and remand for further proceedings consistent with this opinion.

*It is so ordered.*